UNITED STATES DISTRICT COURT  **UNDER SEAL**

DISTRICT OF OREGON

PORTLAND DIVISION

FILED 27 DEC '12 16:50 USDC-ORP

3'12 - CR - 659  MO

UNITED STATES OF AMERICA                   Case No.

v.                                                              INDICTMENT

**REAZ QADIR KHAN,**                              18 U.S.C. § 2339A

Defendant.                                               UNDER SEAL

### THE GRAND JURY CHARGES:

#### COUNT ONE
#### Conspiracy to Provide Material Support to Terrorists

The Grand Jury charges:

**Introductory Allegations**

A.  At all times relevant to this indictment:

1.  Defendant **REAZ QADIR KHAN** is a naturalized United States citizen residing in the Portland, Oregon area;

2.  Ali Jaleel is an unindicted co-conspirator. Jaleel was a Maldivian national who resided outside of the United States;

3.  Jaleel died while participating in a suicide attack on the Inter-Services Intelligence (ISI) Headquarters in Lahore, Pakistan on May 27, 2009;

4.  "Person A" is a naturalized United States citizen residing in the Los Angeles, California area and an acquaintance of **KHAN**'s;

5. "Person B" is an individual residing in Karachi, Pakistan; and

## The Conspiracy

6. The Grand Jury realleges and incorporates by reference paragraphs 1 through 5 of this Indictment.

7. Beginning no later than December 14, 2005, and continuing through June 2, 2009, in the District of Oregon and elsewhere, **REAZ QADIR KHAN** conspired with Ali Jaleel, and others both known and unknown to the Grand Jury, to provide material support and resources, as that term is defined in 18 U.S.C. Section 2339A(b), and to conceal and disguise the nature location, source, and ownership of such material support and resources, knowing and intending that they were to be used in preparation for and in carrying out a violation of Title 18, United States Code, Section 956 (conspiracy to kill, maim, or kidnap persons or damage property in a foreign country).

## Manner and Means of the Conspiracy

8. **KHAN** would use email and intermediaries to provide advice and financial assistance to Jaleel and his family;

9. **KHAN** would provide Jaleel with advice intended to assist him in his efforts to travel undetected from the Maldives and train to commit violent jihad;

10. **KHAN** would use coded language when he communicated with Jaleel in order to avoid detection;

11. **KHAN** would provide Jaleel financial assistance so that Jaleel could attend a training camp in preparation for an attack such as the May 27, 2009 attack in Lahore, Pakistan; and

**Indictment** Page 2

12.     **KHAN** would provide financial support and advice to Jaleel's family while Jaleel traveled to Pakistan and after he died.

**Overt Acts**

13.     In furtherance of the conspiracy, and to effectuate the illegal objects of the conspiracy, one or more of the conspirators knowingly performed one or more overt acts in the District of Oregon and elsewhere, including but not limited to the following:

a.      On December 14, 2005, **KHAN** wrote Jaleel stating that he felt he was "at a stand still "in the matter of knowledge and practice" and that "[e]verything that we used to talk about now seems like a distant dream." In the same email, **KHAN** asked Allah to forgive them for his laxness and inaction.

b.      On January 14, 2006, Jaleel sent **KHAN** an email that referred to past mutual promises he and **KHAN** had made to seek martyrdom in the name of Allah: "where are the words you said with tears in your eyes that 'we shall strive until Allah's word is superior or until we perish'??? 'this world is of no use to us so let's sacrifice ourself [sic] for the pleasure of Allah in his way???"

c.      In April 2006, Jaleel and a small group from the Maldives attempted to travel from the Maldives to Pakistan to train for violent jihad in Iraq or Afghanistan. Jaleel and the group were detained in Colombo, Sri Lanka and returned to the Maldives where Jaleel was ultimately placed under house arrest. Jaleel's efforts failed in part because he lacked a contact in Pakistan and the plan was not "well thought out." Jaleel said that it was his job to "manufacture" a contact in Pakistan during the group's 2006 trip.

/ / /

      d.      On October 16, 2008, Jaleel wrote an email to **KHAN** in which Jaleel said that he had "planned to hasten [his] departure" from the Maldives to Pakistan and may "go quickly to [**KHAN**'s home country] place and proceed without being able to wait for [**KHAN**]," but that he would "leave bread crumbs" for **KHAN**. Jaleel also told **KHAN** that **KHAN** must bring Jaleel's family "even in my abcense [sic]" and let them "join yours."

      e.      On October 19, 2008, **KHAN** responded to Jaleel's email. In the response, **KHAN** provided detailed advice to Jaleel regarding his trip to Pakistan. **KHAN** advised Jaleel to request separate tickets for the outbound and return journeys so that the return ticket could be redeemed for cash.

      f.      In the October 19, 2008 email, **KHAN** offered to arrange for money to be sent to Jaleel, and said he would do his best to help bring Jaleel's family to Pakistan.

      g.      Jaleel left the Maldives for Pakistan in October 2008. Before he left, Jaleel gave contact information for **KHAN** and **KHAN**'s wife to his wives. Jaleel told his wives to contact **KHAN** and his wife for advice or assistance. He told one of his wives that **KHAN** was like a brother to him.

      h.      On October 20, 2008, **KHAN** offered to arrange for Jaleel to receive money in Pakistan from an associate.

      i.      In October 2008, **KHAN** and Jaleel discussed how to hide Jaleel's true purpose in traveling to Pakistan from Jaleel's family. On October 20, 2008, Jaleel wrote, "I think I might not be able to wait... to get a job, but rather I might have to travel." **KHAN** responded, "I understand fully well, but your inlaws don't need to know that..., So for them it is better that they think that you have a job there ( and it is a job and a duty for us ...)."

**Indictment**                                                                                        **Page 4**

j.  On October 23, 2008, Jaleel wrote **KHAN** an email in which he said that he needed to leave the Maldives quickly and that he needed "a quick answer and an advice [from **KHAN**] regarding my situation."

k.  On October 26, 2008, Jaleel told **KHAN** in an email that he needed "$2500 for everything." Jaleel used coded language throughout this email to describe his activities and to conceal the fact that the money was for immediate admission to a terrorist training camp.

l.  In the October 26, 2008 email, Jaleel also asked **KHAN** to take care of Jaleel's family who would "have no options" once they had left the Maldives. Jaleel asked **KHAN** to take Jaleel's family with him, to educate his children, and to "bring them up well."

m.  **KHAN** promised to help Jaleel's family: "I understand your worries about your family. . . . I will try to support them as much as possible."

n.  On October 28, 2008, Jaleel wrote to **KHAN** that he was "now in Lanka and I hope to get to Pak[istan] within two days." This email was sent from Colombo, Sri Lanka. On or about October 31, 2008, Jaleel wrote to **KHAN** that he "hopefully shall leave for the course soon, maybe within days. So do mail me soon so I shall [know] what I need to do here."

o.  On November 3, 2008, **KHAN** sent directions to Jaleel to pick up the money he needed to enter the training camp. Using coded language, **KHAN** told Jaleel to pick up the money from "Person B," a "trusted brother" but to "keep discussion with him to a minimum."

p.  To arrange for this transfer, **KHAN** contacted "Person A," an individual who **KHAN** knew could quickly arrange for Jaleel to pick up money in Pakistan. "Person A" arranged for the money to be available for pick-up from "Person B" in Karachi, Pakistan.

///

  q. On November 5, 2008, **KHAN** offered to "expedite" the travel of Jaleel's two wives from the Maldives to Pakistan if Jaleel thought it was a good idea.

  r. On November 5, 2008, Jaleel wrote **KHAN** that Jaleel was about to "get admission" and would be able to get "entry for 1000 only," so that he would have extra money out of the $2,450 that **KHAN** had given him. Jaleel also told **KHAN** that "my family is now waiting for u to contact. So be in touch with them always and give them hope." Jaleel also asked **KHAN** what he should do with the remaining money. **KHAN** advised him to keep it to send it to Jaleel's two wives in the Maldives.

  s. On November 5, 2008, **KHAN** told Jaleel to leave a closed envelope with "Person B" that could be transferred to **KHAN**. He told Jaleel to write on the envelope: "For REAZ KHAN . . . FROM: AJ Industries Don't write anything extra on the envelope. Any thing you need to write, put it inside."

  t. On November 15, 2008, **KHAN** exchanged email messages with an associate of Jaleel's about how to arrange travel for Jaleel's two wives.

  u. On May 27, 2009, Jaleel and two other individuals conducted a suicide attack at the ISI Headquarters in Lahore, Pakistan. The blast resulted in the death of approximately 30 people (including Jaleel and the other two bombers) and injured 300 more.

  v. Jaleel was recorded in a video released by As Sahab (the media outlet of al-Qaeda), shortly after the attack. In the video Jaleel makes a statement taking responsibility for the attack. Jaleel can also be seen preparing for the attack at a training camp in what is believed to be the Federally Administered Tribal Area of Pakistan.

///

w. On June 2, 2009, **KHAN** wired approximately $750 via Western Union from a Fred Meyer store in Tigard, Oregon, to one of Jaleel's wives in the Maldives.

All in violation of Title 18, United States Code, Section 2339A.

Dated this **27th** day of December 2012.

A TRUE BILL.

OFFICIATING FOREPERSON

Presented by:

S. AMANDA MARSHALL, OSB #95347
United States Attorney
District of Oregon

ETHAN D. KNIGHT, OSB #99298
Assistant United States Attorney
(503) 727-1000