IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )   No. 3:12-cr-659-MO-1
                               )
     v.                        )
                               )
REAZ QADIR KHAN,               )   September 9, 2013
                               )
          Defendant.           )   Portland, Oregon
_____)


**Status Conference**

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL W. MOSMAN

UNITED STATES DISTRICT COURT JUDGE

APPEARANCES


FOR THE PLAINTIFF:        Mr. Ethan D. Knight
                          United States Attorney's Office
                          1000 S.W. Third Avenue, Suite 600
                          Portland, OR 97204


FOR THE DEFENDANT:        Ms. Amy M. Baggio
                          Baggio Law
                          621 S.W. Morrison, Suite 1025
                          Portland, OR 97205


                          Mr. John S. Ransom
                          Ransom Blackman, LLP
                          1001 S.W. Fifth Avenue, Suite 1400
                          Portland, OR 97204


COURT REPORTER:           Bonita J. Shumway, CSR, RMR, CRR
                          United States District Courthouse
                          1000 S.W. Third Ave., Room 301
                          Portland, OR  97204
                          (503) 326-8188

(P R O C E E D I N G S)

MR. KNIGHT:  Good afternoon, Your Honor.  We're present in the matter of the United States v. Reaz Khan. This is Case No. 12-cr-659.  Ethan Knight, appearing on behalf of the Government.  Amy Baggio and Jack Ransom are appearing for the defendant, who is present, out of custody. And we're here today, Your Honor, for a status conference in Mr. Khan's case.

THE COURT:  Thank you.

Ms. Baggio, what are the issues before us today?

MS. BAGGIO:  Good afternoon, Your Honor.

Your Honor, we had hoped at this point in time to be able to give the Court a list of various motions litigation and a time frame for that.  However, we do have yet outstanding discovery with the Government, and until we have received and reviewed that information, I haven't been able to assess additional possible motions, and so therefore today, Your Honor, I'm not prepared to give a comprehensive list of the different types of motion litigation.

THE COURT:  What are the outstanding discovery issues?

MS. BAGGIO:  Your Honor, first there are the images of the seized digital devices.  We have received one image, but many devices have been seized during the course of the Government's investigation of Mr. Khan.  I understand

1    the devices have been imaged by the Government, but we have

2    not yet obtained copies of those images.

3              THE COURT:  Can you give me an idea of what was

4    seized?

5              MS. BAGGIO:  Yes, Your Honor.  I believe there

6    were both hard drives -- I'm sorry, whole computers, as well

7    as smartphones, and they're called the -- the tablet devices

8    that were seized from Mr. Khan's home.  And I would say in

9    the nature of about 20 -- about 20 devices, plus several

10   external hard drives, such as thumb drives.

11             And I understand they've been imaged, but we have

12   not -- there have been a few miscommunications, I think,

13   that have prevented us from getting copies of those devices.

14   As I mentioned, we do have one, but there's several more

15   that we still have yet to receive.

16             THE COURT:  Do you know which one you have?

17             MS. BAGGIO:  Yes, sir.  Well, I know the type of

18   device.  I don't know what it is an image of.  It is a

19   Western Digital external hard drive, but the -- we haven't

20   been told what that is.

21             THE COURT:  Do you have someone retained

22   forensically to help you with that?

23             MS. BAGGIO:  I do, Your Honor.

24             THE COURT:  Has that person only been able to

25   start taking a look at one device, one image of one device?

1        MS. BAGGIO:  He has not started taking a look at

2    that image yet, Your Honor, because I don't know what it is,

3    and I wanted to know what it was before I asked him to take

4    a look at it.

5        THE COURT:  Thank you.

6        Mr. Knight, on this subject?

7        MR. KNIGHT:  The images that were seized from

8    Mr. Khan's residence have been processed as any digital

9    images would be in a criminal case, and they actually have

10   been available at the RCFL for the defendant's designee to

11   copy and image and process.  There's been evidently some

12   miscommunication about the manner in which that would be

13   done.

14       I received an email this morning, letting me know

15   that the defense investigator had contacted the RCFL about

16   that yesterday, and I gave the go ahead to do any additional

17   imaging.

18       The process usually is, as I understand it, the

19   defense designee brings a blank hard drive to the Regional

20   Forensic Laboratory, and at that point the image or images

21   are copied on to that media and given to the defense.

22       So the imaging is done at this point.  It's a

23   matter of process and copying those images for the defense.

24       THE COURT:  Are you prepared to do that?

25       MS. BAGGIO:  Your Honor, we dropped off the two

1    large external hard drives for those images to be placed

2    on -- our copies of images to be placed on to them.  We have

3    asked the Government to assist us in imaging the devices,

4    since they already have them imaged, just copying them on to

5    our provided external hard drives, rather than us incurring

6    the cost of paying some vendor to make an image of an

7    original device, because at this point in time the

8    Government has released back to us all of the original

9    devices.  I believe that happened last week, I believe.  But

10   rather than us pay a vendor to do it, since the Government

11   already has the copies, it seems way more cost effective,

12   from my perspective, for them to make copies for us on the

13   hard drives we've provided to them.  So they have those

14   external hard drives.

15        THE COURT:  The Government has retained the copies

16   of the devices, you have the original devices.  Instead of

17   you making a copy of the original devices, it's cheaper for

18   you to ask the Government to copy their copies and give it

19   to you?

20        MS. BAGGIO:  That is correct, Your Honor.

21        THE COURT:  Why is that cheaper?  Just because the

22   Government does it at their end?

23        MS. BAGGIO:  Well, because, as I understand it, we

24   have to hire a vendor and they have to process all of the

25   originals and make them into copies, using their specialized

software, whereas the Government has already done that.

THE COURT:  Can you do that?

MR. KNIGHT:  I believe so.  I want to check.  I've been asked about this today.  I want to check with the folks at the RCFL to make sure that wouldn't deviate from any protocol, having them copy the copy, because it is -- their protocols dictate the manner in which this stuff can be handled.  If it's not a problem --

THE COURT:  The protocols don't dictate the manner in which this stuff can be handled.  It just dictates the manner in which they handle it.

MR. KNIGHT:  And by that, I guess that's what I meant.

THE COURT:  I need to understand why that's a problem.  Would you let me know that?

MR. KNIGHT:  No, and I'm not saying it is, Your Honor, at all.

THE COURT:  Will you let me know by email to Ms. Stephens what you've learned by the end of the day tomorrow?

MR. KNIGHT:  Certainly.

THE COURT:  Thank you.

Your next matter?

MS. BAGGIO:  Thank you.  And, Your Honor, just for the record, I think it may have come across that we just

1    recently asked for these.  I don't think that's the case.  I

2    think Mr. Knight would concur that we have been asking for

3    the devices; that it's just been taking longer than expected

4    to get the copies.

5         Secondly, Your Honor, we have not received any

6    forensic reports as to any of the digital devices that have

7    been seized.

8         THE COURT:  What does that mean?  What are those?

9         MS. BAGGIO:  That, in my experience, would be the

10   agent's report about what he or she found in executing the

11   search warrants by searching the digital device.  In a case

12   like this, the search warrant allowed them to look for

13   evidence of wire transactions or travel abroad within the

14   digital devices themselves.  After they search for them, the

15   agent then produces a report discussing their findings,

16   especially if the Government sees it's relevant to their

17   case.  We haven't received the reports of that analysis.

18        THE COURT:  So, just so I'm clear, you're not

19   looking at reports generated at the time of seizure, you're

20   looking at reports generated following copying and

21   examination of what was on the devices?

22        MS. BAGGIO:  That's correct, Your Honor.

23        THE COURT:  As to what was found that the

24   Government finds of interest for trial purposes on the

25   device?

1          MS. BAGGIO:  That's correct, Your Honor.

2          THE COURT:  What's the status of those, sir?

3          MR. KNIGHT:  That process is just beginning.  In

4    my experience, Your Honor, that typically takes much longer,

5    because depending on the volume of material on the drives or

6    drive involved, the agent then sits down with search terms

7    and goes through the material, a report is generated.  They

8    haven't been produced quite simply because they do not exist

9    at this point in time, and as soon as I have those in my

10   possession, obviously they'll be turned over to the defense.

11         But the raw data, of course, the drives, do indeed

12   exist, and those are available.

13         THE COURT:  Any sense of the timing of production

14   of those reports?

15         MR. KNIGHT:  I spoke to the agent about the

16   process.  It has begun.  He believes, given the volume of

17   material on the drives, it would be months before the final

18   reports would be produced.  And that's consistent, Your

19   Honor, with similar experiences I've had with this volume of

20   material in other cases.

21         THE COURT:  Three months or 30 months?

22         MR. KNIGHT:  I understood it to be two to three

23   months.

24         THE COURT:  Thank you.

25         Your next item?

1    MS. BAGGIO:  Thank you, Your Honor.

2        The next item I have are the Bates numbered and

3    processed copies of the paperwork that was seized from

4    Mr. Khan's home during the search warrant execution in March

5    of 2013.  I understand from Mr. Knight he has received the

6    disks that include the copies of the paperwork, but it is

7    currently being processed within the U.S. Attorney's Office.

8        THE COURT:  So you'd like a copy of the

9    Bates-numbered copies on disk of the paperwork seized from

10   the home?

11       MS. BAGGIO:  That's correct, Your Honor.  We have

12   a one-page property receipt that lists the different

13   electronic devices seized, and then also batches of

14   documents that will say bank records, travel records and

15   we'd like the paper copies of those with the Bates numbers

16   so that we can process that paperwork, as we have with the

17   other 36,000 pages that we've received to date.

18       THE COURT:  You'd like the paper copies or you'd

19   like a copy of the CD with the digital copies of the paper

20   on it?

21       MS. BAGGIO:  The digital copies are fine.  I just

22   refer to it as paperwork because it was the physical paper

23   seized at the home rather than electronic.

24       THE COURT:  Sir?

25       MR. KNIGHT:  To be clear, the actual materials

seized from the search warrant are and will be available for

inspection at the FBI, as they've been from the outset.

This arises from a relatively recent request to produce

Bates-numbered copies.  We have absolutely no objection or

problem with that.  I have put that as a lower priority as

far as processing after some of the substantive

investigative materials, because the materials are indeed

available at the FBI.  It's my belief, looking through the

materials again this morning, that they could be scanned and

produced in a one- to two-week period of time.

THE COURT:  That hasn't already been done by you

yet for your own purposes?  You don't have the digital copy

of these papers?

MR. KNIGHT:  No.  I have the copy given to me by

the FBI in response to the request, but I do not have -- it

hasn't been scanned and numbered, which is the formal

request, I suppose.

THE COURT:  So just -- you have a digital copy of

the papers that were seized?

MR. KNIGHT:  I received -- yes, two weeks ago in

response to Ms. Baggio's request to actually have copies of

the items seized from the search warrant, as opposed to just

being able to view them in FBI custody, I requested that

that be done and was given a copy of that two weeks ago.  It

is ready to be processed.  I --

1    THE COURT:  By "processed," you mean it has not

2  yet been numbered?

3    MR. KNIGHT:  That's correct, Your Honor.

4    THE COURT:  So you want to Bates number it and

5  then produce it when that's done?

6    MR. KNIGHT:  Yes.

7    THE COURT:  And you think that can be done in a

8  couple weeks?  Is that what you're just telling me?

9    MR. KNIGHT:  One to two weeks for actual

10  production.

11    THE COURT:  That's fine.  Thank you.

12    And the fourth?

13    MS. BAGGIO:  Your Honor, we have not been provided

14  with search warrant execution reports that would help us

15  understand in which room various evidence was seized.  We

16  have been given a very brief search warrant execution

17  report, and we've been given color photographs of the search

18  warrant execution, which shows sort of in standard fashion

19  that the Government used sticky notes to mark different

20  rooms with different letters, but we don't know from where

21  various items were seized, and it would be important for us

22  to know that.  So we are waiting for those reports.

23    THE COURT:  Do you have those reports?

24    MR. KNIGHT:  I'm checking to see if we do.  The

25  response I got in request to Ms. Baggio's request

specifically about that was that there are notes in a 1A
file about that, which I would need to look at.  I do not
believe that 302 reports of the nature that have been
described were generated, but obviously anything that fits
that description we will produce, but I'm looking into that
now.

        THE COURT:  So we'll put that in the one- to
two-week category?

        MR. KNIGHT:  Yes, Your Honor.

        THE COURT:  Go ahead.

        MS. BAGGIO:  Thank you, Your Honor.

        The fifth item I have on my list refers to emails
that were obtained pursuant to court-authorized
interceptions.  I believe that they are FISA emails, Your
Honor.

        And we've had two big problems with the emails as
produced.  One is that because the process is to print them
out, hand redact information off of the email and then scan
the paper copy, what I've identified is in a number of the
emails, the text continued past the right-hand margin of the
email, but we don't have that continuation of text having
been produced, so we have an email that -- in some cases
it's very obvious, it cuts off mid word or even mid
character, but in others it's a lot less clear whether the
email has text cut off or not.  So we have that problem with

1    the emails that were produced.

2         The second problem we have are some of them, a

3    smaller number, but in some of them the quality is so poor

4    that's impossible even to read with the bare eye.

5         Mr. Knight and I have talked about this for some

6    time, and he had asked for us to go through and identify any

7    emails that have a problem on them.  I've been trying to do

8    that.  There are a lot of emails in this case, and quite

9    frankly, Your Honor, it's been difficult because sometimes

10   it's obvious when an email is cut off and sometimes it

11   isn't.  So I know if there's half of an S, that this is one

12   that I need to flag, but others, because a lot of the emails

13   also include somewhat broken English, it's difficult to tell

14   if the email has been cut off substantively or not.

15        So the email has -- Mr. Knight has said, "Just

16   tell me which ones you need and I'll reproduce them," but

17   it's taken us a long time to go through, and it makes the

18   process slower.  It would be more helpful if we could just

19   have them all redone.  If some of them could be redone, it

20   would be helpful to us if they all would be redone.

21             THE COURT:  How many are there?

22             UNIDENTIFIED MALE SPEAKER:  Hundreds.

23             MS. BAGGIO:  I'm hearing hundreds and I'm hearing

24   thousands -- oh, or you mean of the problem ones for sure or

25   just in general?

```
 1              THE COURT:  All of them.
 2              MS. BAGGIO:  I would say -- I would estimate 500
 3    at least, probably, maybe a thousand.
 4              THE COURT:  Do you know whether rerunning those
 5    emails is some sort of difficult production issue or not?
 6              MR. KNIGHT:  I -- it has to be done manually, so
 7    the situation is --
 8              THE COURT:  I'm never quite sure what that means.
 9              MR. KNIGHT:  They are not generated --
10              THE COURT:  They're certainly not being done
11    manually.
12              MR. KNIGHT:  Yeah.
13              The copies that are produced in discovery are not
14    generated by printing them out of a system and then simply
15    producing them nor are they simply copied from the system
16    and turned over.  Each copy that has been declassified of an
17    email, for example, an agent has to by hand cross out the
18    classification markings and confirm that that individual
19    email corresponds to a declassification order that's been
20    signed.
21              THE COURT:  So your contention is that that would
22    have to -- if they were reprinted at the earliest stage --
23    because at some point they're printed, right?
24              MR. KNIGHT:  They're printed --
25              THE COURT:  And if they were reprinted at the
```

earliest stage so that the right margin was correct, then
everything else would have to be redone, the hand redacting?

MR. KNIGHT:  That is correct, which, as I said to
Ms. Baggio from the outset three months ago when this was
raised, if you tell us the numbers, we'll go back in and do
that.  So we'll solve it in any way that's efficient.  But
that is what makes the process more cumbersome than
obviously simply turning over a disk with the same emails.
But we understand they need to see what may be missing in a
few of the emails.

THE COURT:  Well, that would be simple, but that's
not the problem I'm hearing.  The problem I'm hearing is
that Ms. Baggio is never quite sure on any particular email
whether the right margin is correct or not.  If she just had
to give you a list of ten, then we'd be done.  But I think
her concern, as I've understood it, is that possibly all of
them are wrong, and it's just really hard to tell, or at
least such a high number of them might be wrong that there's
no time savings compared to doing it all over again.

MR. KNIGHT:  The concern expressed to me was in
fact that there were a limited number, and that you can
indeed tell, because you can look at the right margin and a
word is cut off mid word or a sentence mid sentence, whereas
you could look at the other 80, 90 percent of the emails and
very clearly tell from context if the entirety of the

1    document is there.  That's how I understood it initially,

2    and it related to the agents.

3          THE COURT:  Well, that's not what I hear you

4    saying today.  So if that's not what you're saying today,

5    then I need to understand it.

6          MS. BAGGIO:  Your Honor, when I first brought this

7    to Mr. Knight's attention, I gave him examples of the

8    obvious ones.  If I poorly communicated to him at that time,

9    I apologize, but what I was trying to communicate was here

10    are obvious examples, and there are many more.

11          THE COURT:  Just tell me if I'm right in my

12    assumption that your current concern is that there's very

13    few, possibly zero emails for which you can have high

14    confidence that you got the whole thing.

15          MS. BAGGIO:  I don't even -- I can't offer any

16    guess as to how many have been cut off and how many have

17    not.

18          THE COURT:  How many have you looked at and

19    determined that they've been cut off?

20          MS. BAGGIO:  I have gone through all of the emails

21    preliminarily, Your Honor.

22          THE COURT:  And so what you're saying is that

23    having reviewed them all, you're never quite sure if they're

24    cut off or not?

25          MS. BAGGIO:  I can't be sure, Your Honor.  I --

it's just impossible for me to tell because of the way the

problem exists, that if the copy just continues to the

right, I never know if I have it all or not.

And I -- I'm glad to do whatever the Court

directs, and I've been trying to work with Mr. Knight on

this, but it seems like it's inefficient or ineffective for

me to say which ones are cut off.  If there is a program

that shows some kind of line and the Government can kind of

scroll through it more quickly to see which pages have copy

going on to the next page or the next column, that seems to

me that would be far more efficient.  But I'll do whatever

the Court desires.

THE COURT:  I'm going to have the Government redo

this, but what would you like me to do about the situation

where someone from the United States looks at the email that

has been produced and the one that's being produced with a

different right margin and sees no difference?

MS. BAGGIO:  So if they could look at the two and

say this one is fine, then move to the next one, and not

reproduce the one that's correct?

THE COURT:  Right.  So what I'm trying to do, if

you're comfortable with it, is save some time by a

representation that what you have in 2,500 of the 5,000 is

identical, whether you would have the old right margin or

the new one that I'm ordering, as opposed to printing --

person A printing 5,000 of them and person B redoing all the redacting. It takes a certain level of confidence, and I guess I can understand either way, it's just that if that's going to get gummed up and misrepresented, it could happen under either system.

What would you like me to do? I'm going to order the whole thing to be redone, but my inclination is to say that if an examination shows that X number of what you've got already is identical to what's produced by a new correct right-hand margin, that no person has to be assigned to re-redact those that are identical. What's your view?

You can speak with Mr. Ransom about that off the record if you'd like.

MS. BAGGIO: Thank you.

(There is a pause in the proceedings.)

THE COURT: Ms. Baggio?

MS. BAGGIO: Your Honor, our request would be to have them all redone, and if the Court would -- I'm glad to give the specific numbers, too.

I'm not trying to be obstructionist here, Your Honor, and I'm not trying to suggest that we won't get what we need, I just -- part of this is a real struggle because it seems like all this information was available electronically originally, and if we could just get it electronically, then all this problem would go away because

it wouldn't lose generation and generation of quality of image.

I understand from talking to Mr. Knight that it has to be hand redacted because of the field at the top, but I just wonder if there would be some way to just grab the content of the email so that we could definitely have the total email content, as well as making sure that it's both of a good quality and we have the complete message.

THE COURT:  Well, the one thing that I'm not at liberty to order is for the defense in this case to simply receive the electronic version of what was seized.  You're free to brief that if you wish.  I might be wrong about that, but that's my impression at this point.

I am going to order a reproduction of all the emails with the correct right-hand margin.  In my view, since -- in my view, there's no point in terms of quality control or trust issues in ordering a re-redaction of any email that's deemed to be identical, new margin or old.  So there will be some timesaving there.

I'm ordering -- since you've explained it as initially a printing of all the emails and then a redaction of those emails in paper form and then a scanning of those emails for other production, then for any email in which a review of the new printed version shows that it's identical to what's already been produced, then I'm not requiring a

1  new redaction, but you will have to identify them so that

2  Ms. Baggio will know that in your review, you've determined

3  that if emails 1 through 2,500, say, are identical, then

4  2,501 through 5,000 have been redone completely with new

5  redactions for a new email that has new words on it that the

6  initial production didn't have on them.

7        That was No. 5.  Do you have a No. 6?

8        MS. BAGGIO:  Yes, Your Honor.  No. 6 would be the

9  transcripts from the second batch of recorded phone calls

10  that were provided in volume 18 of discovery.  They're not

11  in English.

12        THE COURT:  So there's a first batch in English?

13        MS. BAGGIO:  The first batch of phone calls, some

14  were in English and some were not, but we were provided --

15  albeit unofficial -- transcription of the content of the

16  non-English calls, but those have not been produced for the

17  second.  There's a total of 41 phone calls.

18        THE COURT:  And you have the non-English

19  transcripts but not the English transcripts?

20        MS. BAGGIO:  No, I'm sorry, Your Honor.  We have

21  the non-English transcripts for the first batch, the first

22  21 calls.

23        THE COURT:  Yes.

24        MS. BAGGIO:  We've been provided no transcripts

25  for the second batch of calls, which I believe it's 20 -- I

1    believe it's 20 calls, and I don't believe any of them are

2    in English.

3              MR. KNIGHT:  The Government does not have

4    transcripts translated from Urdu to English of these phone

5    calls.

6              THE COURT:  Meaning that you're working on them or

7    not going to do them?

8              MR. KNIGHT:  They will -- that process is being

9    delayed, Your Honor, for budget reasons.

10             THE COURT:  So the initial batch was done and then

11   you lost your translators or something?

12             MR. KNIGHT:  The manner in which funding is

13   allocated has changed in the last -- since the original --

14   the original 20 calls were done.  I was told this time it's

15   a different process for doing them.

16             THE COURT:  So what's the time table, do you know?

17             MR. KNIGHT:  Well, to be clear, the Government

18   would probably wait because of the cost involved in

19   translating these 20 calls.  I mean, the translation of the

20   calls, of course, we do not believe is something under the

21   rules of discovery we are required to produce.  If they were

22   in our possession, I would certainly provide them as a

23   courtesy, but insofar as what is required of the Government

24   at this stage, I don't believe the rules require us to

25   translate the 20 Urdu calls to English under Rule 16.

1          THE COURT:  Wait for a new budget year or just

2     wait to see if it became necessary?

3          MR. KNIGHT:  Frankly, the latter in some respects.

4     Summary translations are different than the verbatim

5     translations, and that's what I'm trying to work out

6     internally with the bureau, Your Honor.

7          THE COURT:  Your response?

8          MS. BAGGIO:  I don't really have a response, other

9     than to say we're waiting for it.  The Court asked what we

10    didn't have, and that's one item.

11         THE COURT:  No. 7?

12         MS. BAGGIO:  Your Honor, other than the general

13    request for discovery that was filed on Friday that goes

14    over some basic areas of requests for information, including

15    most of all I think in this case the general request that

16    the Government provide information about how they obtained

17    the evidence that they provided to us, rather than just

18    referring to it as court-authorized information or

19    court-authorized surveillance, we're asking for the

20    Government to tell us how they got it so that we can then

21    consider what motions litigation would be necessary to

22    challenge those various processes.

23          But other than that general request that we just

24    served on Mr. Knight on Friday, there are no other specific

25    things that I know of that are outstanding at this time,

Your Honor.

THE COURT:  Do you wish to respond to that request now or in writing?

MR. KNIGHT:  Your Honor, I'll respond to that specific request in writing when a motion is filed.

THE COURT:  Well, do you want to treat -- what did you file?  A letter?

MS. BAGGIO:  I filed it as a request, Your Honor. My hope was that we could at a request stage without beginning motions litigation get a response from the Government about what they would be providing to us and if there were items they did not intend to disclose, we could then move forward to the motion to compel stage.

THE COURT:  Do you have some sort of speedy trial concern about treating it as a motion?

MS. BAGGIO:  No, Your Honor.

THE COURT:  Then I treat your request as a motion, and you will respond.  When will you respond to that motion filed Friday?

MR. KNIGHT:  If that is a motion to compel, Your Honor, the Government would request 30 days to respond.  It may -- if it is treated as a motion, it may trigger the Government to have to file additional materials with the Court under the Classified Information Procedures Act.  My practice typically with a discovery request, as I've

discussed with Ms. Baggio, would be to go through it and see

what the Government could provide.

THE COURT:  I'm fine with that.  I just want a

response.  And you told me you wanted a motion to make a

response come due.

MR. KNIGHT:  Well, as to the specific issue that

Ms. Baggio raised, yes.  She at the end there alluded to the

fact that they would like specific notice about the manner

in which information was obtained in the investigation of

their client or under which authority.

THE COURT:  All right.  Then can you respond

informally with a copy to Ms. Stephens to Ms. Baggio's

request?

MR. KNIGHT:  Absolutely.

THE COURT:  And then you can outline in that

response to her request what you think can only be handled

if it's done by formal motion?

MR. KNIGHT:  Absolutely.

THE COURT:  And you can do that in one to two

weeks?

MR. KNIGHT:  Yes.

THE COURT:  All right.  And then I'll take a look

at what needs to become a formal motion, if anything, and

we'll take it from there.

Let me go through what I've done today.  The first

issue raised was images of seized digital devices.  And what the Government has said is that it's either long been available or certainly currently available for the defense to go and copy those, or even to copy its original devices that have been returned.

Ms. Baggio has represented that it's quite a bit cheaper, and for me, since I'm looking at two budgets that come out of the same public FISC, so to speak, I'd like to save money on either side of the house.

And so you're going to look, Mr. Knight at whether in fact that is easier to do and can simply be done at your side by copying your copies.  And you'll tell Ms. Stephens by email by close of business tomorrow whether that's doable or not, and if so, when?

MR. KNIGHT:  Yes, Your Honor.

THE COURT:  All right.  Then there's a question about forensic reports about the products of digital devices seized.  That will be approved as they are created, and currently our best effort is that those will be created in the next two to three months.  So I'll require a status report from the United States in two months on that issue.  That, once again, is an email to your opponent and to Ms. Stephens.

Can you give us a date, Ms. Stephens?

THE CLERK:  Yes.  That will be Tuesday,

November 12th.

THE COURT:  I have ordered the Bates-numbered copies of the paperwork seized to be produced in digital form to the defense in two weeks.  The date for that?

THE CLERK:  9-23.

THE COURT:  I'm sorry?

THE CLERK:  September 23rd.

THE COURT:  I have ordered the production of search warrant execution reports that show where items were seized -- that is, the room in which evidence was seized -- also by 9-23.

I have ordered the reprinting of emails seized pursuant to court-authorized interception under the Foreign Intelligence Surveillance Act with the nuances I've already described I think are clear to the parties.

Do you have a time in which you estimate that can be done, Mr. Knight, just on its own?

MR. KNIGHT:  No, Your Honor.  If I may, I would like to speak with the agents about a time period, and communicate that to the Court and Ms. Baggio in a way to further order.

THE COURT:  Will you be able to do that in the same email that you're producing on the images of seized devices by the end of the day tomorrow?

MR. KNIGHT:  The agent is out of town today, Your

Honor.  I will attempt to do that.  If I do not hear back,
I'll put that information in the email.

           THE COURT:  Thank you.

           I am not ordering the production of transcripts
from the second batch just yet.  There are budget issues and
it is of questionable authority for me to do so under the
rules of discovery.  We'll revisit that issue down the line.

           And then, Mr. Knight, you were going to produce an
email response to the response for discovery from Ms. Baggio
that will also outline in it anything you, in your view,
believe would be better covered by a formal motion.

           When will that email come in?

           MR. KNIGHT:  Your Honor, if I may have to the end
of next week.

           THE COURT:  I'm just going to keep it simple and
put a 9-23 deadline, the same as the other deadline, for the
production to the Court and counsel of that email response.

           MR. KNIGHT:  Thank you.

           Your Honor, may I speak to one of the issues on
the Court's list?

           THE COURT:  Yes.

           MR. KNIGHT:  I do want to make clear to the Court
there was a discussion about the manner in which the emails
have been produced to the defense.  The Government has
always been willing to reproduce the emails in any form that

1    has been easy or amenable for the defense to process them.

2    Today was the first time that the request had been that the

3    entire group be reproduced.  I say that on the record to

4    make clear the Government has not attempted to delay that

5    process, nor have we objected to the reproduction of those,

6    understanding they're critical to Mr. Khan's defense.

7              THE COURT:  Thank you.  I understand how some

8    things only come into clear focus when a hearing is held.  I

9    have enough experience with the three of you not to be

10   concerned about misconduct in any way by any of you.

11             Thank you all.  We'll be in recess.

12             THE CLERK:  This court is adjourned.

13               (Proceedings are concluded.)

--o0o--

        I certify, by signing below, that the foregoing is a correct transcript of the record of proceedings in the above-entitled cause.  A transcript without an original signature or conformed signature is not certified.


/s/Bonita J. Shumway                10/9/2013
_____             _____
BONITA J. SHUMWAY, CSR, RMR, CRR    DATE
Official Court Reporter