```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF OREGON

 3   UNITED STATES OF AMERICA,      )
                                    )
 4             Plaintiff,           )  No. 3:12-cr-00659-MO
                                    )
 5        v.                        )
                                    )
 6   REAZ QADIR KHAN,               )  November 7, 2014
                                    )
 7             Defendant.           )  Portland, Oregon
     _____)
 8

 9

10

11

12

13

14

15                      Oral Argument

16               TRANSCRIPT OF PROCEEDINGS

17        BEFORE THE HONORABLE MICHAEL W. MOSMAN

18          UNITED STATES DISTRICT COURT JUDGE

19

20

21

22

23

24

25
```

```
1
2                              APPEARANCES
3

4    FOR THE PLAINTIFF:        Mr. Ethan D. Knight
                               Mr. Charles F. Gorder, Jr.
5                              United States Attorney's Office
                               1000 S.W. Third Avenue, Suite 600
6                              Portland, OR 97204

7

8

9    FOR THE DEFENDANT:        Ms. Amy M. Baggio
                               Baggio Law
10                             621 S.W. Morrison, Suite 1025
                               Portland, OR 97205
11

12                             Mr. John S. Ransom
                               Ransom Blackman, LLP
13                             1001 S.W. Fifth Avenue, Suite 1400
                               Portland, OR 97204
14

15                             Mr. Ryan O'Connor
                               O'Connor Weber LLP
16                             522 S.W. Fifth Avenue, Suite 1125
                               Portland, OR 97204
17

18

19   COURT REPORTER:           Bonita J. Shumway, CSR, RMR, CRR
                               United States District Courthouse
20                             1000 S.W. Third Ave., Room 301
                               Portland, OR  97204
21                             (503) 326-8188

22

23

24

25
```

(P R O C E E D I N G S)

    MR. KNIGHT:  Good morning, Your Honor.  We're present in the matter of the United States v. Reaz Khan. This is Case No. 12-cr-659.  Ethan Knight and Charles Gorder appearing on behalf of the United States.  Jack Ransom, Ryan O'Connor and Amy Baggio are appearing on behalf of the defendant, who is present and out of custody.  And we're here today, Your Honor, on a number of defendant's motions that are before the Court.

    THE COURT:  Thank you.

    Ms. Baggio, are you prepared to proceed?

    MS. BAGGIO:  Thank you, Your Honor.  I am.

    Your Honor, with the Court's permission, we would suggest the order as displayed on your screen right now.  We would like to begin with the motion to dismiss indictment, which I'll be arguing, followed by the defense motion for a bill of particulars by Mr. Ransom -- I'm sorry, the motion to strike surplusage.  It says me, but it's actually Mr. Ransom as well.  And with the Court's permission, Ryan O'Connor would argue the motion related to the defense request for a jury instruction.  I have cleared this with Mr. Khan, he has no objection to that, but with the Court's permission, Mr. O'Connor would offer that argument.

    And then we have two motions in limine pending today, one that Mr. Ransom filed and one that I filed with

1    regard to the email.

2             THE COURT:  That's fine.

3             MS. BAGGIO:  Thank you.

4             THE COURT:  Mr. O'Connor, have we met before?

5             MR. O'CONNOR:  We have not, Your Honor.

6             THE COURT:  Just give me a brief bio so I knew who

7    you are and where you are from.

8             MR. RANSOM:  Sure.  I attended the University of

9    Portland here in town, undergrad; went to law school at the

10   University of Notre Dame.  I worked at the State Public

11   Defender's Office in Salem doing appeals for several years,

12   and now I'm in private practice here in Portland.

13            THE COURT:  With?

14            MS. BAGGIO:  With my own firm, O'Connor Weber.

15            THE COURT:  All right.  Thank you very much.

16   Welcome.

17            MR. O'CONNOR:  Thank you.

18            THE COURT:  Ms. Baggio, go ahead.

19            MS. BAGGIO:  Thank you, Your Honor.

20            Your Honor, as I stated, I'd like to begin with

21   the motion to dismiss the indictment, and I put together a

22   PowerPoint to try to organize my thoughts on this, and of

23   course wherever the Court wants to go, we'll go, but I

24   thought this could be one way to proceed.

25            Your Honor, we raised three issues as to the

indictment in our motion to dismiss:  First, the general

vagueness in the indictment; secondly, we argue that the

indictment impermissibly charges a double-layered

conspiracy; and lastly that it's vague as to the applicable

maximum punishment.

I'll start with the basic premise regarding a

material support case.  2339A criminalizes the material

support intending to further one of any of over 40 different

offenses.  And I think this is a very important point for me

to make here this morning, Your Honor.  The material support

statute does not criminalize material support offered in

furtherance of some other conduct that's not delineated or

cross-referenced by material support statutes.

And as we address in our briefing as to the jury

instruction and mens rea as to the jury instruction, the

government needs to prove beyond a reasonable doubt that

Mr. Khan knew and intended, in providing the support, that

it would further the separate 956 conspiracy that's

cross-referenced in the indictment.

When I look at the indictment in this case, I see

at least two possible conspiracies that we're talking about

here.  The first, which is consistent with the indictment,

that the government alleges Mr. Khan and Ali Jaleel

conspired to provide support to others.  And the indictment

doesn't state who, where, when, or those specifics, but that

Mr. Khan and Mr. Jaleel together provided that support, knowing and intending that those others would then engage in a conspiracy to kill overseas.  And that, as I said, is consistent with the indictment, which says "conspired with Ali Jaleel."

And we compare this to another way possible way of reading the indictment, or at least the way the government appears to be interpreting its indictment, based on its response, and that is that Mr. Khan and others -- who, where, when we don't know -- conspired to provide the material support to Jaleel, knowing and intending that Jaleel would conspire to kill overseas.

And in their response, when they say that he conspired to provide material support to Ali Jaleel, I see this as a material difference than conspiring with him, in terms of understanding what the government's theory is and enabling us to prepare our defense.

So we have at least these two different ways of looking at the possible conspiracies in the indictment and --

THE COURT:  Can we go back to the -- Well, that's fine right there.

Based on what are you saying that this is the theory you view as consistent with the government's response?

1          MS. BAGGIO:  I base that on the fact that in their

2     response, court record 132, at page 3, they say, hey, the

3     indictment sets forth a factual scenario in which defendant

4     conspired to provide material support to Ali Jaleel, as

5     opposed to the indictment, which says that he conspired with

6     Ali Jaleel to provide support to, and then it doesn't say to

7     whom.

8          Does that distinction make sense, Your Honor?

9          THE COURT:  It does.  I understand the

10    distinction.  I just wanted to make sure where you got that

11    this was the government's theory.  And it's page 3 of the

12    response?

13         MS. BAGGIO:  That's correct, Your Honor.

14         May I proceed?

15         THE COURT:  Yes.

16         MS. BAGGIO:  Thank you.

17         The parties agree that the rule of law as to a

18    challenge for vagueness is set forth in the *Bohonus* case,

19    and those four factors.  And our position is that any of the

20    four, analysis of any of the four brings us right to a

21    conclusion that this indictment is insufficient.

22         Regarding the --

23         THE COURT:  Can I pause you there.

24         I think I understand your double inchoate

25    argument.  It's the vagueness argument I want to make sure I

1   understand better.

2         Is the vagueness argument based on the -- if we go

3   back to the "Some Possible Conspiracies" screen.  Is it

4   based on the question marks in the initial boxes being

5   unanswered, sort of, that there's not enough to go on there,

6   or is it grounded in the inconsistency between the two

7   possible theories itself, or both?

8         MS. BAGGIO:  Both.  And I think also without an

9   ability to make sure that Mr. Khan is being prosecuted based

10  on the same facts found by the grand jury.  And when the

11  indictment isn't clear, then we can't know on what facts

12  they indicted him.

13        Your Honor, the defense -- the defense's ability

14  to prepare is hampered significantly if we can't understand

15  the applicable conspiracy theories, and our ability to

16  adequately advise the defendant of the possible punishment

17  is also hampered if the indictment is not clear as to

18  punishment.

19        As I just mentioned --

20        THE COURT:  I want to make sure I understand

21  again.  You have a third argument, right, that even if you

22  can by the end of today come to an understanding of what

23  those are, you remain unsure whether any current

24  understanding of the theory of the charge fits what the

25  grand jury did or didn't do, right?  In other words, that

there may be some problem between the theory being advanced

now and the actual presentation and decision by the grand

jury.

MS. BAGGIO:  That's correct.  That's correct.

THE COURT:  The reason I'm asking that is if I

understand your position correctly, that's not a problem

susceptible for a post hoc solution.

MS. BAGGIO:  That is correct.

THE COURT:  All right.

MS. BAGGIO:  And in that sense, the possible

maximum punishment and ambiguities as to that are relevant

both as to issue one, the overall vagueness of the

indictment, but also with specific regard to issue three.

And that is whatever the -- the requirement under *Apprendi*

and *Burrage* and *Alleyne* -- I may have mispronounced that --

that the indictment has to provide a specific finding that

the defendant's conduct resulted in the death of victims in

order to --

THE COURT:  Again, that's just the same argument

on punishment, but you're making the same fundamental

argument on criminal liability also?

MS. BAGGIO:  That is correct, because that

ambiguity affects liability, that's correct.

Excuse me.  And just the double jeopardy issue is

the same.  Again, if we don't know what the conduct is, the

conspiracies that they're alleging, we can't defend Mr. Khan and his double jeopardy rights in the future.

And then lastly, I think the difficulty in writing this motion and litigating this motion highlights the fourth factor, and that is whether the Court is able to determine the sufficiency of the charge. And with this ambiguity, it's our position that in fact you can't determine the adequacy of the charge.

So that's our arguments as to the overall vagueness.

The second issue that we raise is the impermissible double conspiracy aspect, Your Honor. And under the *Broce* case, "A single agreement to commit several crimes constitutes one conspiracy," and "multiple agreements to commit separate crimes constitute multiple conspiracies."

And this makes sense because the crime is the agreement. And we understand that.

I think when I originally wrote the motion, Your Honor, I was arguing that there could be no double-layered conspiracies, period, and I'd like to step back from that, Your Honor, because I think in preparing for the hearing and in reviewing the case law, I think that is an overstatement. I believe there can be double-layered conspiracies consistent with the law, and I think there even could be double-layered conspiracies that start with a 2339A and

cross-reference a second conspiracy for a 956.  So I want to
make those positions clear.  We're not saying that per se
it's impossible.

However, what isn't possible is the way they
charged him in this case.  And that is because that when you
have a material support conspiracy charge that's
cross-referencing a separate 956 conspiracy charge, as
Mr. O'Connor addressed in the motion for jury instruction,
the government bears the burden to prove that the defendant
knowingly and intended that support to further the elements
of the 956 conspiracy, which is consistent with the case law
we cited in that motion.

In the *Khan* case cited beside the government and
by the defense, it was a different scenario because the
court in that -- in the Fourth Circuit *Khan* said that it was
okay, it was okay to charge the 2339 conspiracy and the 956
conspiracy because they had separate objectives.

This goes back to where I started, and that is the
importance of the 956 cross-reference in this case.  Without
the elements of the 956, there is no 2339A conspiracy, and
that is because the -- if there was an allegation that
Mr. Khan, knowing and intending to further a bank robbery
provided material support, well, that wouldn't be a material
support case because bank robbery isn't one of the 40 listed
offenses.

1          So, too, we look at the elements of the 956, and

2    what I see here, Your Honor, what I think is happening, is

3    that we know with the elements of a 956 prosecution, one or

4    more of the actors has to be in the United States, and

5    that's what gives federal jurisdiction; it gives the hook.

6          Now, here what I think has happened is that in

7    fact the government is not alleging Mr. Khan's direct

8    involvement in the 956.  They don't want to.  That's why it

9    was charged as conspiracy to provide material support in

10   furtherance of a conspiracy to kill or maim overseas.

11         So either Mr. Khan provides the link to make the

12   956 charge cross-referenceable, I think I'd say, even though

13   it's not an appropriate word, but that's what gives the 956

14   charge legs, because there's no other U.S. person involved,

15   or in fact it's the same offense.  It's the same conduct,

16   it's the same objective.  And if that's the case, then it is

17   an impermissible conspiracy, because there are actually two

18   layers, and that, even under the *Khan* case in the Fourth

19   Circuit, means that this was improperly charged and should

20   be dismissed.

21         THE COURT:  I'm going to pause you there because I

22   think it will help me to make sure I understand the

23   argument, and particularly since it's a little different

24   from the argument I thought you were making in your briefs.

25         So let's start with the latter.  The problem

addressed in the article you've cited I believe is different
than the problem you've just argued.  One is more abstract.
Your argument right now is very concrete both as to facts
and statutory text.

So the abstract argument I think I got, which was
essentially that if you're charging someone with agreeing to
agree, you're really just charging very predicate conduct.
By that I mean conduct that's prior to the commission of any
crime.  If I say, "I'm agreeing with you all that some day
we'll get together and agree to rob a bank," well,
fundamentally I haven't yet agreed to rob a bank, and
therefore what I've done is prior to any criminal liability.

And that's the problem I see raised by the law
review article that you've relied on somewhat, and I think
it is a problem if that's how the crime is charged.  And
what the Fourth Circuit *Khan* case suggests is that that is
not a problem if you have two different concrete goals.  So
it's one thing to say, "I agree that some day we'll get
together and agree to rob a bank."  It's another to say, "I
agree to conspire with people right now to come up with
money to fund somebody else's conspiracy to rob a bank."

Now whatever other problems we have, we don't have
the problem that I'm indicting conduct that's prior to any
real criminal misbehavior.  That's the argument that, in
part, just in small part, I thought you were making coming

1    in.

2          Now I want to see if I understand the shift a

3    little bit, and it sort of turns on the Fourth Circuit's

4    *Khan* decision.  So what you're saying I think is here very

5    specifically, the statute allows for a conspiracy to provide

6    material support, so long as those who conspired do so know

7    or intend that the stuff they're providing, the material,

8    will be used in preparation for or carrying out a number of

9    statutes.  One of them is 956.

10          So the statute seems to suggest that you can

11    conspire to provide material support, knowing or intending

12    that it will be used in a conspiracy to maim or kill

13    overseas.  And you're telling me right now that at least in

14    the abstract, you think that can, by a proper indictment, be

15    charged?

16          MS. BAGGIO:  Agreed.

17          THE COURT:  And the sort of irreducible minimum

18    that you need to successfully pull that off I think are a

19    couple things, if I have you right.  One is that you have

20    two separate objectives, it can't be the same objective; and

21    two, that you have all the elements of 956 alleged.  The

22    indictment needs to allege not only the material support

23    conspiracy but must contain with it all the elements of 956,

24    including U.S. person, for example?

25          MS. BAGGIO:  Because it's relevant to the mens rea

1    burden, correct.

2        THE COURT:  So I have -- so the mens rea you think

3    must be charged and found by the grand jury is double:  a

4    mens rea to conspire with someone to provide material

5    support, knowing what?  What do you think the indictment has

6    to say about what you have to intend or know?

7        MS. BAGGIO:  I believe that's set out in our

8    proposed jury instruction, Your Honor, the knowing and

9    intending and then listing each of the elements of 956.  Not

10   to say that the government must prove all 956 elements, but

11   just that the defendant knew and intended satisfaction of

12   each of them.

13       THE COURT:  Otherwise the defendant didn't know or

14   intend a violation of 956?

15       MS. BAGGIO:  That is correct.  And otherwise,

16   without those key facts in the allegation -- in the charging

17   instrument, we are at a loss as to how to prepare our

18   defenses to -- as -- we're not sure what the grand jury

19   found or what facts made the grand jury think that Mr. Khan

20   knew and intended a 956 conspiracy when, again, the

21   indictment is not clear, but it appears to me that there is

22   absolutely zero United States connection to that 956

23   cross-referenced conspiracy.

24       THE COURT:  Do you have in front of you from your

25   research Count 5 of the Fourth Circuit *Khan* case?

1           MS. BAGGIO:  I don't --

2           THE COURT:  The indictment in *Khan*.

3           The reason I ask is I only have what Fourth

4    Circuit quotes from the indictment, and it quotes basically,

5    "conspiring to provide material support, intending that it

6    be used in carrying out a violation of Section 956."

7           And 956 is in brackets, so I don't know what they

8    actually said.

9           MS. BAGGIO:  Your Honor, I'm sorry, I don't have

10   it in front of me.  My recall was that I tried to get it off

11   of Pacer and it was like a 46-count indictment and the

12   indictment itself wasn't available.  But that's just my

13   recall, but I don't recall specifically.

14          THE COURT:  But the reason you believe that to

15   charge a double conspiracy, such as the one that 2339A

16   allows, the reason you have to set out 956 -- Well, first,

17   your position is that you must -- that the government, that

18   is, must set up that the person conspiring to provide

19   material support knows or intends that all of the elements

20   of 956 are going to happen.  And the reason for that is that

21   otherwise what?  What fails to happen if that doesn't

22   happen?

23          MS. BAGGIO:  Well, I think all four of the *Bohonus*

24   factors are indicated in that, Your Honor:  Our ability to

25   defend the case; to know what the grand jury found; to

1   ensure his double jeopardy rights; and to allow us to raise

2   challenges and then allow the Court to evaluate challenges

3   to the sufficiency of the charge.

4           THE COURT:  All right.  Thank you.

5           MS. BAGGIO:  Your Honor, I think -- again, I'm

6   speculating about why the charging instrument was structured

7   this way.  My -- I believe a reasonable conclusion would be

8   that the government is in a position where they believe

9   they've got clear evidence to document Mr. Khan's support of

10  Ali Jaleel.  However, what's much less clear is evidence

11  related to Mr. Khan's knowledge and intent when he gave that

12  money to Mr. Jaleel in November of 2008, and moreover,

13  ultimately what happened to Mr. Jaleel.

14          And I believe that that's the reason why they

15  charged it this way, not direct material support in

16  reference to a 956, but conspiracy.  So it's one step away

17  from that.

18          And I think that if that -- if the government's --

19  if the government's goal is to have Mr. Khan be responsible

20  for what it believes are Jaleel's actions, the fact of the

21  matter is they can't prove the requisite intent -- excuse

22  me.  The indictment doesn't allege the requisite intent with

23  sufficient clarity to allow the defense to properly present

24  a defense and investigate a defense.  And by using these

25  kind of step-back layers, the conspiracy to commit a

conspiracy, it's attempting to lessen its burden, but it's
our position, based on our papers and the argument, that
that is inappropriate and that the indictment should be
dismissed.

And then the last thing I have is, Your Honor,
with regard to the statutory maximum.  And I think our
argument was pretty clear on that, that it needs to be -- I
referenced at the beginning, I won't be redundant, but that
the finding of the grand jury needs to be in the indictment.

Here the indictment doesn't even allege that
Mr. Khan's support was the cause of death, not to mention it
doesn't allege that it was the but-for cause.  And, in fact,
there's no specific grand jury finding -- and this is
addressed in comparison of our indictment to that in the
Exhibit B that we provided, in which at the conclusion of
the description of the conspiracy, the last line is, "and
this offense resulted in death."  We don't have that.

And I would submit that after *Burrage*, that
wouldn't even be sufficient language, that it would have to
be, "and this offense was the but-for cause of death."

But regardless, it's our position that it's also
vague as to punishment, and at a minimum, the statutory
maximum the Court should find is 15 years, but also we
believe that it's just overall so vague that we're unable to
adequately defend the case, to ensure the grand jury

findings are the same facts on which the government is

prosecuting Mr. Khan, to preserve his double jeopardy

rights, and also finally to allow us to make and the Court

to consider challenges to the sufficiency of the charging

instrument.

THE COURT:  Excuse me.  Could you help me with one

last issue, the preservation of double jeopardy rights.  How

does this play out?  If this goes to trial, what's the issue

you face there?

MS. BAGGIO:  Your Honor, if we're not sure which

individuals are in which conspiracy and which conduct of

which individuals are the basis for the charge, then that --

and we don't adequately object to it at this point, if for

some reason Mr. Khan prevails and the government decides to

bring an indictment later that alleges some of these same

players doing some other aspect of conduct, we wouldn't be

able to properly protect and raise and litigate a double

jeopardy claim against the subsequent prosecution.  So I

think the certainty in the players and the conduct and what

the government's theory is as to who belongs in which

conspiracy and what they did would allow us to properly

protect his double jeopardy rights.

THE COURT:  Thank you.

Let's take these one at a time.

MR. KNIGHT:  Thank you, Your Honor.

1       I will attempt to track the three separate areas
2  of the motion to dismiss and the issues that Ms. Baggio has
3  raised.  And obviously, if there are areas the Court would
4  like me to specifically address, I will do so.
5       THE COURT:  Let's start with the sort of textual
6  analysis as it relates to what you -- what the text, the
7  cross-referencing text would obligate you to do,
8  particularly by way of identifying the elements of 956.
9       MR. KNIGHT:  Yes, Your Honor.
10      I think at the outset, paragraph 7 of the
11 indictment, which lays out the government's theory of the
12 conspiracy, is sufficient under the statute.  And I -- and
13 that's a key point because, I mean, there's a discussion of
14 what is complicated about the facts and there's a discussion
15 about what is legally sufficient.  And while the facts may
16 be complicated as to their relevance to each of the two
17 statutes, including the predicate statute, we think they're
18 sufficient.
19      Now, with respect to the Court's question, we
20 believe the government has an obligation legally to show
21 that there was a conspiracy that the defendant entered into
22 under 2339A to provide material support, and he did so
23 knowing and intending it was to be used for the 956.
24      There is an obligation separately with the 956, we
25 believe, to show that that conspiracy was in fact entered

into, and there was some jurisdiction that gives that

efficacy under the 2339A statute.  So Ms. Baggio is correct

to say that under 956, there needs to be an actor in the

United States for there properly to be jurisdiction.

THE COURT:  An actor in the 956 conspiracy?

MR. KNIGHT:  That's correct.  So the government

has an obligation to show individuals in the conspiracy who

would be in the United States.

THE COURT:  How?  How would we learn that that's

an important part of this case and one the grand jury found

from the indictment?

MR. KNIGHT:  Well, I mean, I think the facts set

out -- well, first of all, the government isn't obligated to

-- it's obligated to present a legally cognizable charge to

the grand jury and in the indictment so that Mr. Khan has

notice of the charges against him and the manner in which

the government is going to proceed.

In this case, because the way the indictment is

phrased and characterized, we believe there are facts

adequate to support findings under 2339A and 956 that there

are persons involved in both conspiracies.  And quite simply

I can lay out the government's theory on that.

THE COURT:  Facts adequate to support found by

whom, when?

MR. KNIGHT:  By the grand jury, the way in which

1        the overt acts are laid out in the indictment that a finding

2        was made that is adequate to support the charge.  And that

3        goes to notice and it goes to vagueness, which are the two

4        concerns in that first part of the motion to dismiss.

5                And I can be more specific.

6                THE COURT:  Go ahead.

7                MR. KNIGHT:  The government's theory, which it has

8        never been shy about advancing -- and this also goes to the

9        double conspiracy argument -- is that the defendant entered

10       into an agreement with Ali Jaleel, with him to support him,

11       to provide material support.  And the statute defines what

12       material support is.  And that that agreement was

13       specifically designed to further, and knowing and intending

14       that they would encourage and support and act to murder and

15       maim and kill individuals overseas.

16               In support of that, the government lays out

17       factually its theory of the case, the communications between

18       Mr. Khan to Mr. Jaleel, the efforts to get money to

19       Mr. Jaleel from Mr. Khan, and what we believe is evidence of

20       knowledge on Mr. Khan's part that in fact the support would

21       result in death overseas.

22               So to that extent, we believe we've provided

23       adequate notice, which I think speaks to the question of

24       vagueness under *Bohonus*, the case that sets the standard for

25       whether or not the indictment itself is impermissibly vague.

1    And I think a lot of the factual arguments that the

2    defendant is making underscore a knowledge of the potential

3    theories and the facts of the case.

4            You know, the claim has been made and the argument

5    has been made that the reason the indictment is inadequate

6    is that the defendant cannot adequately prepare a defense,

7    but the only substantive argument that has been made to

8    support that really is we're not sure who all the

9    conspirators are.  And the government at the last hearing we

10   had explicitly stated who named conspirators are, and that

11   was Mr. Khan and Mr. Jaleel; and secondly, the law is clear

12   that the government is not required to identify every single

13   conspirator in a conspiracy.  So to that degree, we think

14   the defense can adequately prepare a defense, because that's

15   one of the standards for determining whether or not the

16   indictment as laid out is impermissibly vague.

17           THE COURT:  So in terms of two possible

18   conspiracies, one consistent with the indictment and one

19   consistent with your response, I guess what you're telling

20   me is that you believe it's -- you've charged in advance --

21   that is, you've indicted and advanced both -- that Khan and

22   Jaleel conspired to provide support to Jaleel.

23           MR. KNIGHT:  Precisely.  I mean, the

24   characterization of this as an inconsistency we just simply

25   think is inaccurate.  I mean, they're conspiring with each

other, because that's the definition of a conspiracy, it's
an agreement, and the agreement has to be to give material
support to someone, because that's the way the statute is
written.  And this is not new news.  This has always been
the theory that --

THE COURT:  And your indictment, you contend,
makes clear, at a minimum, that the conspirators for the
2339A are Khan and Jaleel and others, and that the material
support is provided to Jaleel?

MR. KNIGHT:  Precisely.  And there are paragraphs
setting forth specific transactions and actions we believe
were undertaken by this defendant to provide support to
Mr. Jaleel.  They're agreeing with each other to provide
that support.  And that is not an uncommon, and perhaps the
most common interpretation of this statute and the manner in
which it's used in reported cases.

THE COURT:  You've told me, I think, that the
combination of the written words of the indictment and the
presentation to the grand jury cover notice and vagueness.

MR. KNIGHT:  Well, I mean, there are a couple of
issues here.  I think there is the motion to dismiss on the
basis that it is vague, and then -- I'm understanding a
separate argument to be that they cannot be certain that the
grand jury properly considered the evidence in the
indictment.  I see those as two issues now.

1          THE COURT:  All right.  So let's start with the

2    latter one.  So one of the arguments you're facing is that

3    the grand jury, under a sort of *Apprendi* argument, not so

4    much for sentencing, but overall, needed to have presented

5    to it the question whether the elements of 956 were in the

6    defendant's mens rea somehow.

7          Do you agree that that is required; and if so, do

8    you agree you did it somehow?

9          MR. KNIGHT:  I do not believe it's required,

10   because what is required is that we present to the grand

11   jury facts supporting of the alleged criminal conduct for

12   which they found a violation under the probable cause

13   standard.  The statute he is alleged to have violated is

14   2339A.  However, there is a predicate statute for which we

15   are obligated to explain and -- explain its role in relation

16   to the 2339A.  So I think the answer to the second --

17         THE COURT:  I don't think people disagree that

18   that's the legal framework, it's just that when you say you

19   are under an obligation to explain how 956 cross-references,

20   how much of an obligation?  What is it about 956 you are

21   obligated to put in the indictment and present to the grand

22   jury, in your view?

23         MR. KNIGHT:  That there are facts sufficient to

24   show that a 956 conspiracy -- well, indeed occurred or that

25   that was the purpose of the agreement between Mr. Khan and

1      Jaleel and others.

2              THE COURT:  So do those facts -- does that require

3      you to show that there are facts sufficient to show that the

4      elements of 956 were met?

5              MR. KNIGHT:  With a predicate offense, I do not

6      believe the law requires a showing that all of the elements

7      of the predicate offense be committed in order to commit the

8      underlying offense.  However, it's the government's position

9      today, given the facts in this case, that we did, and it is

10     our theory that there are facts sufficient to show that this

11     individual had the mens rea for that underlying conspiracy,

12     and that that's presented in the overt acts in the

13     indictment as well.

14             THE COURT:  I don't mean to quibble, I just want

15     to make sure I get it that you believe that in this case you

16     have facts and, in fact, presented to the grand jury facts

17     sufficient to show that this defendant knew all he needed to

18     know to touch on all of the elements of 956.

19             MR. KNIGHT:  That's right.  Because Ms. Baggio

20     makes a point that is an accurate one, which is there does

21     need to be some jurisdiction for that 956, which means a

22     person in the United States.  And there are a limited number

23     of people in the United States for which liability could be

24     attached, we think, for the 2339A.  So the answer is yes, we

25     believe we have.

1          THE COURT:  Let me just back up for a second.  So

2     your initial legal position is that in a cross-referencing

3     situation like this, you're not obligated to show that

4     someone in a 2339A conspiracy knows of all of the elements

5     of the cross-referenced crime; that it may happen here, but

6     that's not your legal obligation?

7          MR. KNIGHT:  That's right.  Because what they have

8     to know is that it's intended to commit the predicate

9     offense.

10          THE COURT:  All right.  So is jurisdiction a

11     special case?  I mean, do you always have to prove that?

12          MR. KNIGHT:  No, but in order for I think the

13     offense to be cognizable in some way, you need to show that

14     jurisdiction exists.  I mean, I think --

15          THE COURT:  You need to show it in the indictment?

16          MR. KNIGHT:  No, I don't believe so.  And again, I

17     mean, our theory --

18          THE COURT:  A U.S. person in 956 is a

19     jurisdictional prerequisite for that cross-referenced

20     statute to be a valid cross-referenced statute in a 2339A

21     conspiracy?

22          MR. KNIGHT:  That's right.  I mean, I don't think

23     the government could go forward if it knew it did not have

24     jurisdiction for a predicate offense.  I don't think it

25     could present something to the grand jury.  And I'm speaking

1   a little out of turn that it knew it did not have

2   jurisdiction and therefore the offense itself, you know, was

3   not cognizable --

4          THE COURT:  I guess that's the main point I'm

5   getting at.  I think I hear you saying that it is sort of

6   a -- it's a necessary piece of the presentation somehow of

7   the case that the cross-referenced crime have at least a

8   jurisdictional element met.  And so I'm just asking, if

9   that's part of the case, is it necessary for you to put it

10   in the indictment and present it to the grand jury?

11          MR. KNIGHT:  I don't believe the law requires

12   that.  I think the law requires -- and I'm not saying it

13   didn't happen.  I think the law requires that the government

14   accurately represent and present the manner in which the

15   statute makes the conduct criminal.  I think part of that

16   would be the jurisdiction, arguably, because it would not be

17   an offense unless jurisdiction existed, so --

18          THE COURT:  So do you agree that the

19   jurisdictional element of 956 isn't in the text of the

20   indictment?

21          MR. KNIGHT:  That's right.  And I don't think

22   it's in the -- because it's not in the text of the statute

23   that Mr. Khan is alleged to have violated.

24          THE COURT:  But it is in your grand jury

25   presentation?

1        MR. KNIGHT:  We believe it's in the facts of the

2   overt acts that the defendant knows, and therefore it was in

3   the grand jury presentation.

4        THE COURT:  Go ahead.

5        MR. KNIGHT:  So that sort of speaks, I think, the

6   indictment a little bit, Your Honor.  And with regard to the

7   inconsistency, I think I've touched on that argument, or the

8   alleged inconsistency.

9        I want to again, then, get to what I think is the

10  remaining argument on vagueness, which is preparing -- being

11  able to prepare a defense, which has been the claim.  And I

12  think we've addressed that, to the extent that there is

13  nothing specific we are hearing that suggests a defense

14  can't be prepared.  In fact, every argument seems robust and

15  would belie that claim.

16       And then double jeopardy was the last argument

17  made in support of that position.  I'll get to the

18  punishment issue later because I see that as a separate

19  argument.

20       THE COURT:  Well, let me see if I can walk through

21  this in my own mind for a second.  I apologize that I do

22  this a lot.  It helps me make sure I understand the parties'

23  positions.

24       So I think you're saying in response to what

25  Ms. Baggio has argued that as to the textual requirements, I

think I understand your argument for why you've met them;
that you don't have to lay out in the indictment all of the
text -- the elements of 956.  There's a sort of a core
requirement to meet the criminality charged in 956, and you
think you've done that both in your overt acts and in your
grand jury presentation, particularly as to jurisdiction.

As to the idea that Ms. Baggio has advanced that
she's not sure which of more than one theory the government
is advancing or the grand jury heard, I think your answer --
help me here if I'm wrong -- is that the inconsistencies,
the multiple possible conspiracies she's pointed out really
aren't that; there's just one conspiracy, and it can't
really fairly be broken out into multiple inconsistent
conspiracies.  Have I got that right?

MR. KNIGHT:  That's right.  And let me follow up
on that.  I mean, I think on the jurisdiction issue, one
more point I want to make, and I think I perhaps complicated
it too much.

I think the first line in the indictment is that
we are alleging that Mr. Khan is a naturalized citizen
residing in the jurisdiction of this district.  And so from
that, you know, we believe that, again, the grand jury
presentation adequately meets any jurisdictional question.

THE COURT:  All right.

MR. KNIGHT:  Now, the Court's question on multiple

theories, pleading and proof are two different things
generally in any criminal indictment.  The government isn't
obligated to plead -- it can plead multiple theories for
which there may be various avenues of proof.

I'm understanding the argument to be that they --

THE COURT:  Let me stop you there for a minute.
Is that what you're doing right now at this point in time?

MR. KNIGHT:  No.

THE COURT:  Are you pleading multiple theories and
having to elect which one you're going to advance?

MR. KNIGHT:  No.  Actually, I think in this case,
given the complexity of this case, the government has been
quite transparent and quite straightforward about the manner
in which it's proceeding in this case and what the facts
are.  So that's why it's confusing to the government when
the statement is made that the defense can't adequately
prepare a defense because the indictment is impermissibly
vague.  Substantively, there do not seem to be arguments
that support that, other than a conclusory statement that
it's vague; we don't know what the government is doing.  The
only thing we're hearing is that it's not clear which
conspiracy or which conspirators are involved.

THE COURT:  Well, do you have a paper copy of the
PowerPoint presentation in front of you like I do?

MR. KNIGHT:  I do.

1        THE COURT:  Early on, there's this "Some Possible

2    Conspiracies" slide with blue and red bubbles.

3        MR. KNIGHT:  Yes.

4        THE COURT:  So that's not her only argument, but

5    at the core is the sort of inconsistency argument that there

6    are two very different possible conspiracies here.  They're

7    very different from each other.  They trigger different

8    mens reas, and the defense doesn't know which one you're

9    advancing.

10       What's your response to that?

11       MR. KNIGHT:  Well, I'll -- I will state which one

12   we're advancing, but I think it's clear from the indictment,

13   and that is that the defendant entered into an agreement

14   with Mr. Jaleel to provide him material support for the

15   purpose, and knowing and intending that that support would

16   be used to carry out the crime of 18 U.S.C. 956.

17       Now, there may be others involved in the

18   conspiracy, particularly the 956 conspiracy, but the

19   evidence and manner in which we plan to present it at

20   trial --

21       THE COURT:  You've been very clear about the

22   mens rea in the left-hand side of the boxes, very clear

23   about what you contend the mens rea is.  And now I'm going

24   to ask you to be clear about which of the two different

25   mens reas in the middle boxes you're advancing.  Whether

1    that solves the problem or not remains to be seen, but those

2    are two different mental states requiring different

3    defenses.

4             MR. KNIGHT:  Well, you know, I think, looking at

5    this, that to say knowing and intending Jaleel -- well, I

6    mean, I don't -- it is not clear they're as different.  I

7    mean, one contains Jaleel's name and one does not, but there

8    were multiple people involved in the conspiracy, so --

9             THE COURT:  I guess there's three answers.  It's

10   either the first box, the second box, or both.

11            MR. KNIGHT:  Well, in just looking at this,

12   without parsing out the words, to me it seems both, because

13   the red box seems to exclude any other people who may be

14   involved in the 956 conspiracy, and that's never been the

15   suggestion.

16            THE COURT:  That's your answer -- right? -- is

17   that what you're contending and what you presented to the

18   grand jury is that Khan and Jaleel conspired to provide

19   material support to Jaleel and possibly others, knowing and

20   intending Jaleel and possibly others would conspire to kill

21   overseas.

22            MR. KNIGHT:  And to be totally transparent, the

23   "possibly others" is a more salient part of the latter of

24   the two sets of boxes than the first, because the agreement

25   is between those two, and there are obviously multiple

people involved in the bombing.  And so the conspiracy to

commit the 956, of which we are alleging these individuals

were part of, involved multiple people.

THE COURT:  And then lastly, your answer as to the

who, where, when question is that that's a funnel that a

trial travels down and we're getting closer to that all the

time, but you're not required to be there yet in this stage

of challenging the indictment?

MR. KNIGHT:  That's right.

THE COURT:  All right.

Do you wish to respond?

MS. BAGGIO:  Thank you, Your Honor.

Your Honor, I'm still not sure who is in the 956

conspiracy.  If we can start with the chart there.

Going back to the mobile -- or the box, what I

understood Mr. Knight to say is we would be in the red box,

knowing and intending Jaleel and others would conspire to

kill overseas.

If that's their position, then there is no 956

connection to the United States because Mr. Khan isn't in

the middle box.  And that's why it's important for us to

understand.  That's why it's important for us to know in

moving forward and defending the case, filing motions and

that sort of thing.

THE COURT:  Is that a separate -- just a motion to

dismiss the indictment?  Right now you're alleging that you

don't know.  What if you knew?  Then wouldn't you just be

filing a separate motion to dismiss, saying that's a vaguely

brought indictment?

MS. BAGGIO:  Precisely.  It's a material element

to have the properly referenced cross -- properly

cross-referenced statute adequately pled.  If that is

adequately pled -- and we understand the 956 theory by the

government is that it doesn't involve Mr. Khan directly at

all, it's Mr. Jaleel and others who allegedly committed this

bombing, then our position would be, well, then there is no

jurisdictional connection, just like the government admitted

they need at the beginning of its argument.

THE COURT:  Do you wish to jump up here?

MR. KNIGHT:  I do.  I'm sorry, Your Honor.

I think I can save everyone a lot of work to

clarify.  We are saying that Mr. Khan would be part of the

956 conspiracy.  956 is a conspiracy.  It is not an

allegation of an attack.  So when Ms. Baggio says that the

government is saying that Jaleel and others were responsible

for the bombing, that's a factually different issue.

We're saying that Mr. Khan, in an agreement with

Jaleel, was conspiring to murder, maim or otherwise kill

overseas.  So we've never been -- that's what I'm saying.

We know there is a jurisdictional necessity that somebody in

1  the United States for a 956 to occur be part of that

2  agreement, and it's been our theory that Mr. Khan is in an

3  agreement to effectuate the goals of that separate

4  conspiracy.  And I can address that in the double conspiracy

5  piece, but to save the issue of --

6          THE COURT:  So I'm sort of punting the issue of

7  whether any vagueness questions can be solved by the

8  government's positions in court, but it may solve some but

9  perhaps not all, but it's still worth doing.  So it appears

10  the government's answer is, you know, just to use your chart

11  here, that it's the red box with a couple of additions,

12  knowing and intending that Jaleel, Khan, and others would

13  conspire to kill overseas.

14          MS. BAGGIO:  Two points on that.  First of all,

15  yes, the indictment doesn't say that; but number two, then I

16  think we're in the Fourth Circuit *Khan* problem that I

17  argued.  It's all the same thing.  There is then no

18  separate, distinct objective.  It's all the same thing.

19          THE COURT:  Tell me what you're relying on from

20  *Khan*.  What language are you relying on from *Khan*?

21          MS. BAGGIO:  Yes, Your Honor.

22          THE COURT:  I want to get more clarity on that

23  thought.

24          MS. BAGGIO:  I believe both parties cited to the

25  same language in *Khan*, Your Honor.

```
 1              THE COURT:  What page?
 2              MS. BAGGIO:  On page 8 of the defense memorandum.
 3              THE COURT:  Do you happen to know the Khan page?
 4              MS. BAGGIO:  I beg your pardon?
 5              THE COURT:  Do you know the page to the Khan
 6    opinion?
 7              MS. BAGGIO:  Oh, I'm sorry.  I believe --
 8              THE COURT:  It's got to be 492 or 493, right?
 9         Tell me if this is the language you're relying on.
10    I'm quoting from Khan at the very beginning of page 493:
11              "Courts have recognized that one
12         conspiracy can serve as the predicate for
13         another conspiracy when the overarching
14         conspiracy and the predicate conspiracy are
15         distinct offenses with entirely different
16         objectives."
17              MS. BAGGIO:  That is correct.  I apologize.  I see
18    I omitted the pin cite from my brief.  That's correct.
19              THE COURT:  So your idea is that if Khan and
20    Jaleel conspired to provide support, knowing and intending
21    that Khan and Jaleel and others would conspire to kill
22    overseas, that that fails to satisfy the requirement that
23    the overarching conspiracy have a distinct objective from
24    the predicate conspiracy?
25              MS. BAGGIO:  That's correct, precisely.
```

1          THE COURT:  Thank you.

2          Go ahead.

3          MR. KNIGHT:  Speaking now to that second issue as

4 it relates to the *Khan* case, we believe the defense has

5 conflated the fact that there are -- that the same person is

6 in each conspiracy with somehow undermining the

7 two-objective requirement.  If we dial this back a few steps

8 and look at the law review article that Ms. Baggio initially

9 cites and the rationale in *Khan*, and the *Stewart* case, which

10 is a Second Circuit case -- because there's a string of

11 these cases that talk about this, this concept -- it is

12 impermissible, obviously, to conspire to commit a conspiracy

13 of the same offense.  I mean, that's the double conspiracy

14 as we understand it that is written about.

15          So what *Khan* is talking about very clearly -- and

16 the decision itself doesn't offer a lot of analysis.  It

17 appears, because it's building on these other cases, is that

18 you need -- you can conspire to commit a conspiracy, and

19 each conspiracy has a separate objective.

20          Now, in this case, each conspiracy has, by

21 definition, by operation of law, a separate objective.  The

22 objective of a conspiracy to violate 2339A is to provide

23 material support, as the phrase "material support" is

24 defined.  The objective of 18 U.S.C. 956 is to kill, murder,

25 maim or damage property overseas.  So the objectives of

1    those two conspiracies are different.

2         The argument that counsel appears to be making

3    about why in fact they are one and the same is because some

4    of the facts are the same that support each conspiracy and

5    Mr. Khan is present in each conspiracy.

6         THE COURT:  I think the real argument is that the

7    goal of the material support of the conspiracy is to maim or

8    kill overseas.

9         MR. KNIGHT:  Well, the goal of material support is

10   to provide material support, and then it may ultimately be

11   to kill, murder or maim overseas, but the statute

12   contemplates those two separate things.

13        THE COURT:  Well, you know, you can split words a

14   lot of different ways.  I mean, I understand your argument

15   that as a legal matter the statute material support creates

16   an objective to collect material support, but, you know, if

17   you asked what is the -- what is in the minds of the -- what

18   is the objective, the purpose of the conspirators who are

19   providing material support, in this case it's the same

20   objective as the second conspiracy.  They all have the same

21   overarching goal.

22        My problem with the argument Ms. Baggio is

23   making -- actually, I'll turn to Ms. Baggio here -- is that

24   that would really eliminate 2339A in most cases.  I mean,

25   most cases like this, you'll have a material support

conspiracy that will share the objective of the -- *Khan*
calls it an overarching conspiracy and a predicate
conspiracy, which the overarching would be the 2339A
conspiracy, and the predicate would be the 956 conspiracy.
In almost every case that I'm aware of that I can
contemplate, you'd have this problem.  It would be a problem
that would erase the statute.

That may be what needs to happen, but I just want
to make sure that I understand.  In other words, in almost
every case, the people who are conspiring to provide
material support, knowing or intending that it be used to do
something, are going to share the objectives of the people
who are going to use it to do something.  Therefore, in
almost every case you'd have an illegitimate double
conspiracy, and that seems to run counter to at least the
holdings of *Khan* and others.

MS. BAGGIO:  Yes.

THE COURT:  So, for example, in *Khan* itself, the
Fourth Circuit *Khan*, it's very similar to our case in terms
of who is wanting what to happen.  You have a Count 5 in
which the defendants were convicted of providing --
conspiring to provide material support to, you know, assist
a conspiracy to kill, kidnap or maim.  I'd be shocked if the
facts in that case weren't that the people who were
conspiring to provide material support had the objective in

common with the people who were conspiring to kill or maim.

So your argument about what *Khan's* holding -- what *Khan* should do -- *Khan* now talking about Fourth Circuit -- would make the decision in *Khan* wrong.  If the principle is that the people who are in the 2339A conspiracy, if they have in common the goal of the 956 conspiracy, then that's illegitimate, that's pretty clearly what happened in the Fourth Circuit opinion in *Khan*.

MS. BAGGIO:  I think preliminarily, Your Honor, there aren't that many cases on this, but we have is a statute, a material support statute that can be charged directly, and in that sense, you would have material support for a conspiracy to commit a 956, and under those circumstances, this issue would not happen because there would be no double layer of conspiracy.

In this case, the government chose to -- As Mr. Knight referenced, the discussion in *Khan* about this issue is very minimal, in fact, but --

THE COURT:  They certainly didn't spend an hour and a half on it.

MS. BAGGIO:  Well, I would just add one other point on that, and that is that when the government does usually charge -- when the government does charge a conspiracy to commit a material support, and then one of the cross-referenced statutes, in the cases that I've looked at,

1 handful though there are, the cross-referenced statute is

2 also charged as a separate count.  And in that sense it

3 makes it much more clear that both of the crimes are

4 separately charged, and the grand jury makes

5 separate charging -- made separate findings as to both.  I

6 think that's the distinction that makes a big difference in

7 this case.

8         THE COURT:  All right.  Thank you.

9         Let's turn to the -- I think the next one you

10 wanted to run through is -- Mr. Ransom, you wanted to go on

11 bill of particulars?

12         MR. RANSOM:  Yes.  Thank you, Your Honor.

13         For the most part that issue has been argued by

14 Ms. Baggio because the purpose and the reason for our desire

15 to have the names of the co-conspirators is to determine

16 exactly what is charged in this indictment and what we have

17 to meet in regard to each of the -- what we believe are two

18 alleged conspiracies in this case.

19         This is not a case in which anybody is in danger

20 or there's some reason the co-conspirators must be hidden

21 from us.  There's no real reason not to disclose the names

22 at this time.

23         If we wait, Your Honor, if we wait until we get to

24 trial or right before trial, we're going to run into

25 Rule 801 problems.  Secondly, we're going to run into issues

about did we have an adequate opportunity to defend this
case by interviewing the individuals who are the alleged
co-conspirators.

As has been noted, there's no one in the United
States who is an alleged co-conspirator in this case, a
knowing co-conspirator in this case.  That means they're all
in Pakistan or they're all in the Maldives or in Saudi
Arabia or somewhere else, and if those are not disclosed to
us until right before trial, then we have to ask the Court
for a continuance or a setover so that we have an adequate
opportunity to defend the case, as should be provided to us.

It should further be noted that we still do not
have all the emails.  The government has notified us that
there are further emails that are material and relative to
this case, and we don't have them.  And those emails may
contain statements of other co-conspirators or people who
have not been identified, about who we know nothing.

The indictment in this case came down
December 27th of 2012.  One would think by this time the
government would have had an opportunity to provide us all
the material that we should have as a matter of course in
any discovery proceeding.

So the discovery of the names of the
co-conspirators in this case, particularly even if they're
not going to be witnesses at court, but their statements may

be used, are necessary for us to defend Mr. Khan.

Thank you.

THE COURT:  Thank you.

So there are a number of elements in the bill of particulars.  Quite a few of them are simply further discovery requests that I don't view as the sort of thing I would try to resolve in a bill of particulars, but Mr. Ransom has raised two other issues raised by the bill of particulars.  One I guess would come from No. 1 and No. 2, which is really what we've just been talking about with Ms. Baggio.  So in that sense, he's correct, he didn't need and didn't add anything to the argument we already had there, and I don't need to hear more on that.

And then the third of the three is this idea that the better preparation of this case is to as early as possible disclose an issue that on the particulars of this case will eat up a lot of defense preparation time, given travel and the like.

I know we've set out a schedule.  Remind me, first of all, of the schedule.  When under the current schedule would the government disclose the names of other co-conspirators in general and 801 statements in particular?

MR. KNIGHT:  Your Honor, I believe it would be currently February 9th of 2015, which is the -- when the trial memoranda are due.  And I'm -- in part that's from the

1   Court's order on discovery as relates to co-conspirator

2   statements.

3           THE COURT:  What are the obstacles to disclosing

4   the names of co-conspirators?

5           MR. KNIGHT:  Your Honor, we had this discussion in

6   the context of discovery before.  There really aren't.  And

7   we've been transparent.  This is not a case where there is a

8   list of folks we are waiting to release to the defense.  I

9   frankly can't contemplate that there are any more

10  conspirators or names that are going to be released to the

11  defense that are contained in the discovery that we're

12  withholding.

13          This is a conspiracy that the two principal

14  participants, their communications have been largely

15  provided to the defense.  There's not a list of names or

16  other folks that have yet to be provided.  So we're sort of

17  at a loss on this.  I mean, I've told this to counsel

18  repeatedly.  There are not more conspirators that we are

19  planning on presenting at trial that we have not shared with

20  the defense.

21          THE COURT:  So you contend you've shared in some

22  form all of the information about all of the people that you

23  know to be involved.  What you haven't done yet, which

24  you'll do in February, is identify which co-conspirator

25  statements you intend to introduce at trial?

1          MR. KNIGHT:  That's right.  The use of the

2    statements and the manner in which we intend to introduce

3    them we think is a separate question than the notice or the

4    broader issue of who is involved.

5          THE COURT:  All right.  Thank you.

6          MR. KNIGHT:  Thank you.

7          THE COURT:  Mr. Ransom, do you wish to be heard

8    further?

9          MR. RANSOM:  Other than to say, as I think Judge

10   Burns used to say, that is the meat of the coconut.  Without

11   the identification of who the 801 statements are, it's a

12   little hard to do.

13         THE COURT:  All right.  Thank you.

14         MR. KNIGHT:  Your Honor, I'm sorry.  There was one

15   more issue on the motion to dismiss I don't know if the

16   Court would like government response to.  That was

17   Ms. Baggio's third point related to notice of the

18   appropriate punishment under the statute.

19         THE COURT:  I think you've covered that in your

20   briefing.  Was there something not covered in your briefing

21   you wanted to say?

22         MR. KNIGHT:  No, Your Honor.

23         THE COURT:  All right.  Surplusage.  Are we back

24   to you, Ms. Baggio?

25         MR. RANSOM:  No, that's actually mine, Your Honor.

1          THE COURT:  All right.

2          MR. RANSOM:  And I will not spend a great deal of

3     time on this.  We've argued about the caption, but the Court

4     I think has indicated it is not going to provide the

5     indictment to the jury, and if it does not provide the

6     indictment to the jury, then the caption is meaningless.

7     But the caption --

8          THE COURT:  I don't typically do that and I don't

9     see a reason to do that here, so -- and I should make clear

10    that clearly the charges are explained to the jury in some

11    way very clearly, but the indictment itself I find usually

12    not particularly helpful to the jury if we agree on

13    explaining the charges.  So there will be a 2339A

14    instruction, of course there will, and a 956 explanation of

15    some kind.

16         MR. RANSOM:  That's fine, Your Honor, but again

17    it's the caption which used the word "terrorist" when the

18    term "terrorist" is not used in the substance of the statute

19    itself anywhere, as there is no crime of terrorism.  The

20    government keeps talking about it's going to talk about the

21    crime of terrorism.  There is no crime of terrorism.

22         THE COURT:  Well, I'm sure we'll take up later

23    through a motion in limine from you about trial discussion

24    of -- and use of the word "terrorist," but to the degree

25    your motion today is directed to the caption of the statute,

you're right, it's mooted by my decision not to present the
indictment to the jury.

       MR. RANSOM:  And then we had talked about the term
"as such," which is in the indictment.  This goes again to
what Ms. Baggio was talking about, the adequacy of the
indictment itself.  They could have said "as such" or "such
as" --

       THE COURT:  "Such as"?

       MR. RANSOM:  -- excuse me, the Twin Towers.  They
could put anything.  But the fact is, there is no concrete
statement regarding the murder, which is the substance of
the 956 conspiracy which is alleged in the indictment.  We
do not believe "such as" is adequate to cover what the
statute itself requires.

       THE COURT:  Thank you.

       I agree that's an important issue, but only in the
context of the motion to dismiss the indictment or challenge
the indictment as to penalty.  I don't think it's
surplusage.  I think it just may be inadequate.  The
argument that I'm dealing with is that it's inadequate to
trigger the enhanced penalty.  Now, of course, if I agree
it's inadequate to trigger the enhanced penalty, then I'll
strike it.

       MR. RANSOM:  Thank you.

       THE COURT:  Mr. O'Connor?

1          MR. O'CONNOR:  Thank you, Your Honor.

2          THE COURT:  Actually, let me -- well, I hate to

3    cut you off at the knees here, but I think the debate isn't

4    what should the jury instruction be but whether we should

5    try to resolve this right now.  The government has said that

6    jury instructions were too early.  And I disagree.  I don't

7    disagree that for a complete set of jury instructions we're

8    too early.  I do disagree that we ought to wait longer to

9    resolve this sort of debate.  We spent a lot of time on it

10   today, and I'd like to sort out in some way the mens rea

11   requirements for the jury instruction.

12         So let me ask you this.  Tell me what you think

13   that jury instruction would look like.  Are we speaking of

14   the -- how you'd frame the 2339A instruction?

15         MR. O'CONNOR:  That's correct, Your Honor.

16         We set out a proposed instruction on page 6 of our

17   motion, and that's what we believe the instruction should

18   look like.

19         And what we're attempting to communicate to the

20   jury there is that the government has to prove beyond a

21   reasonable doubt that Mr. Khan had the specific intent when

22   he entered into the conspiracy to provide material support

23   to commit the 956, and that specific intent flows to the

24   elements of the 956.

25         And the other courts that have considered this

issue are unanimous that -- that the specific intent does

flow to the cross-referenced 956, and I believe the

government has acknowledged that already this morning.  And

so we proposed the instruction on page 6 to communicate to

the jury that they must find that beyond a reasonable doubt.

Like I said, Your Honor, we're basing that both on

the text of the statute and on *Mehanna* and *Stewart*, what the

Ninth Circuit mentioned in the *Humanitarian Law Project*

decision that was overruled on other grounds.

And as those cases say, and as the text of the

statute makes clear, the cross-referenced 956 is required.

The knowledge and intent to provide the material support, to

advance and to further the preparation or carrying out of

the 956 is an element of the culpable mental state.  The

mens rea must go to every element of the 956 in order to

constitute the conspiracy to commit 2339A.

THE COURT:  Thank you.

Do you have any objection to the proposed

instruction on page 6?

MR. GORDER:  Yes, we do, Your Honor.

I guess, Your Honor, since I'm standing up I've

already lost the argument that this is premature, so I'm not

going to spend a lot of time on that.

But I think that to try to craft this jury

instruction without reference to some of the other jury

1   instructions is going to be difficult.  I mean, we just

2   spent an hour talking about the theory of 2339A and 956.

3   When we submit our jury instructions -- and if the Court

4   requests, we'll do it earlier than February -- you know, I

5   want to try to craft jury instructions that are as simple as

6   possible for lay people to understand.  And sometimes just

7   re -- you know, basically rehashing the statute is not

8   sufficient.

9        I mean, another thing I would do is weave in the

10  definitions of conspiracy that the Ninth Circuit has

11  approved in the standard instructions with the -- you know,

12  the explanation of 2339A and 956.

13       So I can tell you this, Your Honor.  I've been on

14  this case about six months, and I'm still learning what the

15  facts are.  And I know the Court is probably smarter than I

16  am, but you haven't had the opportunity yet to really

17  understand the evidence that we're going to be presenting.

18  The jury instructions need to be crafted in a way that deals

19  with the facts that are going to be presented in court.

20       THE COURT:  Well, let me -- let me assuage your

21  concerns a little bit.  When I say that I agree, I didn't

22  mean that we'd right now here today then come up with a

23  final jury instruction.  What I agree is important is to

24  come to a resolution of this issue, the mens rea issue, and

25  a jury instruction is a good tool for doing that.

1          So the language can be amended later.  It may even

2     have to be amended in light of the evidence presentation at

3     trial.  That happens all the time.  And there, of course,

4     may be other instructions like a conspiracy instruction that

5     would be either folded in or would predate this instruction

6     so the jury would already have that knowledge.

7          I intend to use this just as a tool to make sure

8     that the issue that is of the most pressing concern to the

9     defense here, and one which I agree needs to be a concern,

10    is resolved, and that's, you know, what are the real

11    mens rea requirements.

12         So just taken as an abstract proposition, not as a

13    final jury instruction, do you have philosophical

14    disagreements with the way the mens rea is described in the

15    proposed jury instruction?

16         MR. GORDER:  A little bit, Your Honor.  And I

17    think -- if I can find the instruction.

18         You know, for example, in the second-to-the-last

19    clause, where we start talking about the special maritime

20    and territorial jurisdiction of the United States, I don't

21    think that needs to be in there.

22         THE COURT:  Well, here's what I'm most concerned

23    about.  The proposed instruction essentially says that this

24    defendant had to -- there had to be an agreement between

25    this defendant and Ali Jaleel.  We'll punt for today whether

you get to add the word "and others" there.  By the time we

get to the jury instruction, probably not.

"To provide material support" -- I'm looking just

at the mens rea language -- "knowing or intending that the

support would be used in preparation for or to carry out an

agreement by a person within the U.S. and other persons to

commit murder."  We'll just simplify it that much.

So that's the double knowledge:  He has to know

that he's conspired; he has to know that the material

support would be used in a conspiracy to murder.

Isn't that pretty much what you've advanced?

MR. GORDER:  It's similar, Your Honor, but I just

think it's a little -- it could be phrased in a more simpler

fashion.  In other words --

THE COURT:  Sure.  I'm not going to get at how we

will say this to the jury.  I'm trying to nail down as best

we can whether you and the defense now are on the same page

as to what the mental state requirements are that you're

advancing and that they have to defend, both for defense

purposes and ultimately for double jeopardy purposes.

MR. GORDER:  I don't think we're that far apart,

Your Honor, but I do think that there is a much better way

to craft this instruction, and would like obviously some

time to do that.

THE COURT:  How soon can you submit your own

1    proposed jury instruction on the subject covered by the

2    proposal on page 6 of the defense memo; basically the 2339A

3    instruction?

4              MR. GORDER:  Your Honor, I think, if -- let me

5    look at a calendar here, part of which is messed up by my

6    other case responsibilities.

7              By November 25th, which is the day before

8    Thanksgiving.  So basically I'm going to be gone the week of

9    the 16th, and I have a number of other matters to handle

10   next week.

11             THE COURT:  All right.  Go ahead and do that by

12   the 25th.

13             Don't fold in a definition of conspiracy.  That

14   may happen at trial, it's just not going to help us with

15   this issue.

16             And then my own -- my own view is that whatever

17   the jury instruction looks like, I don't think there really

18   is any longer after today any real disagreement about what

19   the mental state requirements are between the parties.  And

20   so that will help us get that far.

21             And then with that jury instruction, that,

22   Ms. Baggio, becomes sort of the clearest written statement

23   of the government's position on, for example, U.S. person

24   and the like, and then you know what you need to know for a

25   substantive challenge, if you think you have one, as we

1   discussed earlier, that there's a fatal flaw in the
2   indictment somehow.  Does that make sense to you?
3              MS. BAGGIO:  Yes, I understand what you're saying,
4   Your Honor.
5              THE COURT:  All right.  So the 25th.  Thank you
6   very much.
7              I guess you'd call that a win, Mr. O'Connor.  Is
8   that your first win in federal court?
9              MR. O'CONNOR:  It is.  It's my first appearance in
10  federal court.
11             THE COURT:  All right.  You're on a roll.  You
12  might want to quit now.
13             I have reviewed the motions in limine, and so on
14  third-party acts, I think I'm comfortable with the current
15  schedule.  We are -- I'm going to think about that, though.
16  It's very similar to the bill of particulars argument, in
17  the sense of getting at the 801 statements.  So I'll think
18  about whether we need to advance that or not.
19             The motion in limine as to the emails raises a
20  serious discovery issue.  I don't view it as an issue that
21  I'm going to resolve by in-limine preclusion of email now.
22  What I do want to resolve is where we are on, first,
23  providing all relevant emails; and, second, providing them
24  in the format that looks like what we'll be using at trial.
25             I guess my first concern is that on page 2 you

suggest more emails are awaiting declassification.

MR. GORDER:  Yes, Your Honor.  As you will recall in the email motion, there is a -- Ms. Baggio points out that, you know, we provided in discovery certain emails that are replies to, you know, the previous email and didn't necessarily produce the previous email.

However, most often, I believe, the previous email is on the reply that was provided in discovery, but there may be some -- there apparently are some where she thinks they may not be.

So one of the things we've asked the FBI to do is to have those I would call original emails declassified.

And then there's some other emails that we've determined should be provided in discovery.

I'm not -- as of yesterday, the declassification process has not been finalized, and I guess I would hate to be pinned down as to exactly when that's going to happen. My experience is that unless things are emergencies, they take a while in Washington, D.C.

So what we are -- you know, we are moving as quickly as we can to get that material declassified and to the defense.

THE COURT:  Are you seeking declassified emails that you want to use at trial or emails that you just think are relevant and therefore discoverable?

MR. GORDER:  More the latter, Your Honor.  There may be some that we would use in trial, but primarily this is more a discovery issue than a -- than actual emails that we want to use in trial.  We haven't quite settled ourselves on what emails we will use in trial.

THE COURT:  And then the second issue is that on several occasions in your response, you offered to provide what I'll just call clean copies, copies that will end up looking different for trial purposes than the copies that you've provided to the defense.

Now, sometimes I think that raises, in my mind, at least, very little concern that -- copies that will get rid of non-Roman numbers or letters, that doesn't concern me that much.  But others raise more substantive issues, you know; for example, presence or absence of metadata.

MR. GORDER:  Correct, Your Honor.

What our intentions are at this time -- let's just, for argument's sake, say that we're going to introduce 30 separate emails for the jury.  What we will do is produce what I call a clean copy of the email; in other words, without all the other extraneous things that may be on the emails that come from the FBI.

Generally I've had defense attorneys, for example, that complain if "secret" is crossed off rather than blacked out or whited out.  And, you know, some of the other

1     material that the FBI adds when we print these things out in

2     their system will be redacted so that the jury is going to

3     get presumably what the authors and the recipients of the

4     email themselves got.

5            With regard to the 30 emails -- just that many --

6     we will print out and -- you know, there have been some

7     problems with the printing process, you know.  We

8     acknowledge that.  We will print out an email with the

9     metadata that was received by the FBI from the ISP or

10    whatever source we got the email from.  Now, sometimes it

11    has the IP address in the metadata, sometimes it doesn't.

12    Part of that depends on how the email was accessed by the

13    recipient or the sender, whether it was done through Outlook

14    or done through the web.  And I'm not a real technician on

15    this, Your Honor.  But we will be able to print out all of

16    the metadata for the emails that we want to introduce that

17    the FBI received.  So --

18           THE COURT:  You're talking about maybe three

19    different things, and two of them don't create big problems.

20    One I've already mentioned, that if you have these sort of

21    random symbols and you get rid of them later, that's fine.

22           The second is that if you provided to the defense

23    emails that have, you know, classification marks or other

24    things from the FBI on them, and they now have those, and

25    then in trial you just make clear that you're only going to

create an exhibit that is clean and doesn't have any of that
on them, then that's fine also, because they today know what
that exhibit mostly will look like.  It will be the email
without whatever the FBI added later.

The third is that you've described in your
response that there are occasions where the method, whether
stored email versus contemporaneous or other methods, the
method of acquisition means that you do or don't get
metadata.  And you suggest that you in the future intend to
produce emails with metadata that haven't yet been produced
that way; in other words, new production.

MR. GORDER:  Correct.

THE COURT:  Tell me about that.

MR. GORDER:  Well, when Mr. Knight and I sit down
and we figure out these are the 30 that we want to introduce
at trial, we'll ask the FBI to produce those, print them out
with all the metadata on them so that we can provide that
version to the defense.

THE COURT:  What do you mean by metadata in that
situation?

MR. GORDER:  In other words, whatever the FBI
received in the course of their collection from the ISP,
let's say.  In other words, if a particular email came from
Yahoo and the FBI got it from Yahoo, we will be able to
print out all of the -- whatever metadata Yahoo sent.  That

1      can vary, depending again, as I understand it, on --

2              THE COURT:  Why isn't that what you would have

3      already provided in discovery?

4              MR. GORDER:  Because there was some problems in

5      the way it was printed out from the FBI's system.  So it was

6      just a printing problem, Your Honor.

7              THE COURT:  So you intend to provide what may have

8      been missing through that process --

9              MR. GORDER:  Yes.

10             THE COURT:  -- from the ISP to the defense as to

11     the emails you intend to use as exhibits at trial?

12             MR. GORDER:  Correct.

13             THE COURT:  Thank you.

14             MS. BAGGIO:  Your Honor, as to the motion in

15     limine regarding email, I agree, based on the government's

16     response and the way things have developed, it is premature

17     in a way, because in them -- in the government providing the

18     exhibits, as attached to its response, it makes clear to us

19     that the government has access to essential information that

20     we need now.  And what we would say to the Court is that

21     based on the government's response, that the Court should

22     order that the government produce the email in a

23     standardized format as electronically stored information to

24     the defense.

25             THE COURT:  What do you mean by that?

MS. BAGGIO:  Yes, Your Honor.

When I review the government's explanation, whether the problem was missing fields of data or inaccurate characters or text that went off beyond the page, the government, upon my specific objection, was able to fix it. They were able to fix it by going back to whatever electronic version of that piece of evidence that they had and reproduce it in paper form to me.

This is a cause of great concern for me, Your Honor, because as set forth by my expert's declaration, the metadata is incredibly important for the defense to evaluate the email messages, not just the 30 that the government may want to introduce, but many of the others that are relevant to our investigation of this case, especially in a situation in which a lot of the email use happened through Internet service providers, so that a person could go to the library and log on to a Hotmail account or go to a grade school and log on to the same Hotmail account.  And so the information is obtained not off the computer at my home, with an ISP address to my home, but instead there may be some important evidentiary information that can be derived from the IP addresses associated with different messages.

THE COURT:  So can I pause you there for a moment. The government is saying two things about how metadata does or doesn't make it to you.  One is that the method of

1  acquisition may affect how much metadata one gets, and so

2  from the original source -- "original" means ISP -- you

3  might get different fields or even different general

4  information, depending on whether you're acquiring it, say,

5  from stored email versus something more contemporaneous.

6          Are you seeking to have the government go

7  backwards further than that in time in any way?

8          MS. BAGGIO:  I believe, based on the government's

9  exhibits, that's required, Your Honor, because it was

10  represented to the defense previously, you have what we

11  have.  And --

12         THE COURT:  Well, no, my question must not have

13  been clear.  I'm saying that if the government gets from

14  Yahoo email in a certain form, are you seeking to have the

15  government provide any information beyond what it got from

16  Yahoo?  And there may be something missing between what it

17  got from Yahoo and what you eventually got.  We'll talk

18  about that in a second.  But you're not seeking, are you,

19  for the government to give you anything more than what it

20  got from Yahoo?

21         MS. BAGGIO:  You are correct.  That is precisely

22  what we're asking.

23         THE COURT:  We're really talking about the

24  government giving you something different than what it got

25  from the ISP?

 1          MS. BAGGIO:  That is correct.

 2          THE COURT:  Whether through photocopying problems,

 3    printing problems, system problems, whatever it might be,

 4    you want those?

 5          MS. BAGGIO:  That's correct.

 6          THE COURT:  And if I'm clear on what you're

 7    saying, you want that for all emails?

 8          MS. BAGGIO:  That is correct.

 9          THE COURT:  For the reasons your expert outlined?

10          MS. BAGGIO:  That is correct.

11          THE COURT:  All right.  Anything further on that?

12          MS. BAGGIO:  Just, Your Honor, Mr. Gorder

13    referenced they would include whatever the FBI got in its

14    collections.  And that's what we're asking for, Your Honor.

15    I think based on the defense's specific objection to missing

16    information, and the government's ability to provide it upon

17    request, that tells me that they have access to information

18    not yet provided to us.

19          Our government's -- our expert's declaration,

20    rather, explains why that information is crucial, and I

21    provided to the Court an additional email exhibit, which is

22    marked Exhibit C-1 and C-2, that provide another example of

23    upon specific defense objection to the emails provided in

24    C-1, we were given information and told, "This is what we

25    have," and then upon the Court's order for the government to

go back and reproduce it in Exhibit C2, all of the portions

that are highlighted represent new content that was

available to the defense based on the Court's order for

reproduction.

So it wasn't simply adjusting a margin.  There was

substance that was omitted, based on the printing process.

And if we were able to have the information as the

standardized format is -- as electronic -- as electronically

stored information, that would avoid really the government's

ability to give us the parts they want, whether

intentionally or even because of the particular operator who

is producing the messages.  And I think it's just too

important in a case like this, where the only evidence

that's been disclosed to the defense of communications

between Mr. Khan and Mr. Jaleel or Mr. Khan and Mr. Jaleel's

wives are all in email.  And therefore the evidence couldn't

be more important to us doing our job.

THE COURT:  Are you able -- are you deep enough

into it where you and your expert are able to identify the

remaining emails from which you seek further metadata, or is

it simply that you want to make a blanket request?

MS. BAGGIO:  I believe I referenced numbers in my

original motion, Your Honor.  Those were based on our best

efforts to flag messages that were missing particular

fields.  So in that sense --

1          THE COURT:  You've already done it?

2          MS. BAGGIO:  I've already done it, that's correct.

3          THE COURT:  All right.  Thank you.

4          Yes, sir?

5          MR. GORDER:  Your Honor, just two things:  One,

6     with regard to providing the defense with the electronic

7     information in an electronic form, I've had several

8     discussions with the FBI technical folks about that, and

9     frankly I've been unable yet to confirm whether they

10    consider the ESI version of the email still classified.  The

11    problem is that when they receive it from the ISP, it comes

12    with some kind of electronic information that identifies the

13    portal that the ISP sends it to the FBI, and that's a very

14    sensitive piece of information.  If they try to strip that

15    out of the electronic version of the email, it will change

16    what they call the hash value of the email and make it

17    difficult to authenticate that this is the actual email that

18    came from the ISP.  So --

19         THE COURT:  I'm going to pause you there for just

20    a moment, then.

21         Do you know off the top of your head, Ms. Baggio,

22    how many specific requests you've got on the table right

23    now?  Is it hundreds or dozens --

24         MS. BAGGIO:  For emails?  I'm sorry, Your Honor.

25         THE COURT:  Yes.  Are you talking about hundreds

1  of requests or dozens or how many are we talking about?

2       MS. BAGGIO:  I believe with messages missing

3  somewhere in the chain, it was around 166, and that was the

4  largest batch.  And then other flagged issues, as set forth

5  in my briefing, whether it was missing fields of data or

6  that sort of thing, I think those were more in the

7  neighborhood of between 18 and 35.

8       And may I also say, there could be some overlap,

9  too, one that is missing a message is also missing a field.

10       MR. GORDER:  So just to finish up, Your Honor, I

11  think we're limited at this point to just physically

12  printing out the information as the best way to provide it

13  to the defense.

14       THE COURT:  Well, I guess that's what I was

15  getting at.  That's a fairly high number but not an undoable

16  number to print out, and that, you know, in terms of

17  changing the hash value, that allows you to print out and

18  redact classified information that ultimately doesn't --

19  wouldn't assist the defense, for example, in knowing anyway

20  whether the log-on was at home or at a school or an Internet

21  cafe.

22       And you've produced everything else, right?

23       MR. GORDER:  Correct.  I think the problem is, at

24  least from reading the original motion, I mean, it doesn't

25  identify -- it says there's like a hundred emails, and I

don't know which hundred we're talking about, which is why

I've offered, you know, the 30 -- and again, that's just

hypothetically -- that we want to introduce at trial, we're

happy to print out.  I don't want to require the FBI to go

back and reprint everything unless it's absolutely

necessary.

THE COURT:  Well, I disagree that the limit ought

to be what you intend to introduce at trial.  Certainly

there are other emails, or at least in doing their due

diligence, without knowing for sure, the defense is entitled

to learn some of the things it's learned already with some

of the cleanup, presumably of some value -- at least that's

the representation being made to me now, that some of this

has been valuable in defense preparation.

So I am going to ask you, Ms. Baggio, to identify

the further email -- the further emails from which you would

like to receive a printed copy.  What I'm going to assume is

that getting a printed copy with purely classified

information redacted effectively gives the defense what was

received by the FBI.

And on that assumption, you're just making a

request for printed copies of the emails, and that will be a

couple hundred, right, something like that?

MS. BAGGIO:  I would much prefer, Your Honor,

electronic copies to avoid the problems that we have been.

And as the government has explained, sometimes we don't have a field because we don't have it, and sometimes we don't have a field because of the way they printed it. With that understanding, I can't know unless I have the electronic --

THE COURT: Well, let me do it this way, then. I understand the concern Mr. Gorder has raised, and what I don't want to do is cause deletion of classified fields to mess up what you get. So I'm requesting that the government -- I'm requesting you to submit to the United States -- you may already have done so -- the emails that you wish to receive in complete form that you think you haven't received yet in complete form. As I said, it sounds like that's a couple hundred maybe.

And I'm requesting the government to provide those emails in the form received from the source. That can be done in whatever way allows you to delete classified information.

So when you got something from Yahoo, it -- I guess from the source, the portal may have been on there indicated somehow, and you're allowed to delete that. Whether the only way to delete that is to print them with that page deleted, then that's what we'll have to do. If there's a way to do that electronically without messing up the email, you're free to do that also. But I'm requesting that you give to the defense the identified emails in the

1 form received by the FBI or any other agency from the source

2 minus deleted classified information.  We'll take it from

3 there.

4    MS. BAGGIO:  And may I make one request, Your

5 Honor?  Could I wait to provide my list until I'm given the

6 new emails that I understand are coming?  Because my reading

7 of the government's response is they're trying to fix some

8 of this already, and I don't want to ask them to do the same

9 thing twice.

10    THE COURT:  Yes.  And so certainly what you appear

11 to have already on the table is -- the entire email chain is

12 a project you're already undergoing, right?

13    MR. GORDER:  Correct, Your Honor.

14    THE COURT:  That's fine.

15    I'm not going to put dates on this yet.  You know

16 my ruling.

17    And then, Ms. Baggio, Mr. Gorder, you'll let me

18 know if I need to step in again to make this happen in a

19 timely way.

20    Otherwise, I'm taking these issues under

21 advisement.  We have this email ruling and we have the

22 timetable set on the jury instruction.  And the other issues

23 I'm going to think about some more and take under

24 advisement.

25    Yes, sir?

1          Let me finish the under advisement thought.  So

2    it's going to take me a little while.  I'm going to be

3    missing from the district for a little while here upcoming,

4    and then upon my return, shortly after that, in trial.  So

5    it may be -- it may be clear toward the latter part of this

6    month -- I hope not, but possibly clear toward the latter

7    part of this month before I can fully resolve the motions on

8    the table today.

9          Mr. Knight?

10         MR. KNIGHT:  I'm sorry, Your Honor.

11         The parties had discussed and we wanted to bring

12   this to the Court's attention now while we're all here.

13   Obviously we have a schedule that's sets forth deadlines for

14   a number of issues.  There is the outstanding motion

15   relating to notice that has affected the timing of the

16   filing of motions related to the Foreign Intelligence

17   Surveillance Act.

18         THE COURT:  Right.

19         MR. KNIGHT:  The reason I bring that up today --

20   the parties have discussed this -- is because of the

21   sequence of events that takes place after the filing of

22   those motions, that may put us past what is currently set

23   for the deadline of the trial documents before we resolve

24   those issues.  So the parties are just looking at the

25   calendar and --

1          THE COURT:  We'll adjust that as necessary.

2          If I have this right, you've asked for a chance to

3  brief this, in light of the letter from the government

4  you've received, and you're where on that briefing?

5          MS. BAGGIO:  I filed that on the 5th, Your Honor.

6          THE COURT:  All right.  I missed that.  Thank you.

7          So you'll do what next?

8          MR. GORDER:  Your Honor, we're waiting for you to

9  make a ruling on the notice issue.

10          THE COURT:  You don't intend to file anything

11  further than just your letter?

12          MR. GORDER:  No.

13          THE COURT:  All right.  I'll rule on that as

14  quickly as I can, and then you'll know on the notice issue

15  and that will start triggering the other motions you have in

16  play.

17          MS. BAGGIO:  That is correct.

18          And Your Honor, you had asked me originally, you

19  said, once I rule on this, how long do you need.  I think I

20  quickly said two weeks.  And I would just like to put on the

21  record it depends on the Court's ruling, and of course if

22  the Court were ultimately to decide that the government

23  needed to provide some additional notice to the defense,

24  then there would be additional time involved.  So I just

25  wanted to qualify my two weeks, that I'm not sure that I

1    would be able to get it done in two weeks.  It would depend
2    on what the Court said about the issue.
3              THE COURT:  It depends, right?  Isn't that the
4    answer?
5              MS. BAGGIO:  Yes, sir.
6              THE COURT:  It depends.  All right.  I can live
7    with that answer.
8              MR. GORDER:  And, Your Honor, just, I guess, a
9    request in the mode of a suggestion.  When you rule on that
10   issue, I think the parties and the people at the National
11   Security Division that are interested in the Court's ruling
12   would appreciate some kind of a written opinion or order
13   rather than just a minute order, you know, kind of
14   explaining your reasoning, if that's possible.
15             THE COURT:  Thank you.
16             All right.  We'll be in recess.
17             THE CLERK:  This court is adjourned.
18             (Proceedings concluded.)
19
20
21
22
23
24
25

--o0o--

          I certify, by signing below, that the foregoing is a correct transcript of the record of proceedings in the above-entitled cause.  A transcript without an original signature or conformed signature is not certified.


*/s/Bonita J. Shumway*                    *12/5/2014*
_____         _____
BONITA J. SHUMWAY, CSR, RMR, CRR    DATE
Official Court Reporter